**Affirmed in Part, Reversed and Remanded in Part, and Majority and Dissenting Opinions filed February 28, 2012.**



In The

# Fourteenth Court of Appeals

---

### NO. 14-10-01000-CV

---

### ARLINGTON HOME, INC., Appellant

### V.

### PEAK ENVIRONMENTAL CONSULTANTS, INC. D/B/A LIVE OAK ENVIRONMENTAL CONSULTANTS AND SANDION, LTD, D/B/A COLDWELL BANKER UNITED REALTORS, Appellees

---

### On Appeal from the 113th District Court
### Harris County, Texas
### Trial Court Cause No. 2006-47620

---

## O P I N I O N

In this tort case, appellant Arlington Home, Inc. challenges the trial court's entry of a judgment notwithstanding the verdict ("JNOV") in favor of appellees Peak Environmental Consultants, Inc. d/b/a Live Oak Environmental Consultants ("Live Oak") and Sandion, Ltd. d/b/a Coldwell Banker United Realtors ("Coldwell Banker"). In two issues, Arlington challenges the trial court's grant of the JNOV and its award of attorney's fees to Live Oak and Coldwell Banker. Although we affirm the trial court's JNOV, we reverse and remand on the attorney's fees issues.

# BACKGROUND

Naela Kaki, a Saudi Arabian woman who travels to Houston to receive cancer treatment, signed an earnest money contract (the "contract") on August 26, 2005, for purchase of a $5.35 million house near Memorial Park in Houston. She then assigned her rights under the contract to Arlington Home, Inc., a corporation specifically created to purchase and own the residence. The president of Arlington was Sammy Haress. When Kaki and her family had to return overseas, Coldwell Banker agent David Young supervised the process of obtaining inspections for the home before closing. Because an engineering report had revealed mold and water damage to the house in the past, Arlington requested a mold inspection. On September 8, 2005, Young contacted Gary Martens, a licensed mold assessment consultant who operated Live Oak. The assessment needed to be done quickly because the contract option period expired September 13, 2005. Arlington would owe an additional $250,000 under the contract if closing did not occur timely. Martens provided a proposal in which he stated that Live Oak would perform the following tasks as part of his inspection:

> Live Oak will perform a visual inspection of the interior areas of the structure for the presence of mold. If visible evidence is identified, Live Oak will collect a tape sample for submission to the laboratory for analysis.
>
> In addition, Live Oak will collect up to ten air samples: nine samples will be collected in the interior of the residence; a single air sample will be collected outdoors for comparison to the indoor results. Following collection of the samples, they will be delivered to the laboratory for analysis. Rush turnaround time for laboratory analysis is approximately one day.
>
> Following the receipt of the laboratory analysis, Live Oak will issue a report which contains the sample results and will include any recommendations for remediation, further testing, etc.
>
> The estimated cost for the inspection and laboratory testing services as indicated above is estimated not to exceed $1400.00 which includes the inspection, all sample media and equipment, 10 air samples and analysis. If additional samples are required/requested, the additional cost of $110.00 per sample will apply. Live Oak will not exceed the number of samples

proposed without prior authorization from the client. If less samples are collected, we will adjust the price accordingly.

If this proposal meets with your approval, please fax us a signed copy of this authorization letter. Live Oak will schedule sampling activities immediately upon receipt of your authorization. At this time, we have scheduled the sampling event for Friday morning, September 9, 2005 at 9:15 AM. Payment is due upon completion of the sampling event.

Upon our receipt of the laboratory results, we will contact you by telephone to give a verbal report of the mold inspection. A written report, including laboratory results will follow in a day or two. The final report for this project will be forwarded to the address below unless otherwise instructed.

Martens was not informed of the size of the home, or that prior inspections had revealed mold and water damage. Martens initially performed a visual inspection of much of the property. While there, he discovered that the engineering report had recommended a mold inspection and had described specific instances of water intrusion into several areas of the home. He did not change the nature of his inspection based on this newly discovered information. During his inspection, he was unable to gain access to a few areas of the home, a fact not disclosed to Young or Arlington. He took seven air samples from inside the home and one from outside the home. After receiving the results of his samples taken during the inspection, Martens emailed Young:

> Just received the lab results for the subject property. It passed. No Stachybotrys ("toxic black mold") or Chaetomium spores; these are the primary indicators of a moisture problem.
>
> *The interpretation of the lab data coupled with the observations made at the time of the inspection* indicate no significant mold amplification expected to pose a threat to the subject property or its occupants.
>
> A complete written report, with copies of the laboratory results will be issued.

(emphasis added).

Young forwarded this information to Harres. At the time that Haress received this information, Arlington could have abandoned the contract without penalty and had its earnest money returned. Arlington closed on the property on October 17, after a delay due to Hurricane Rita. During remodeling of the home in November, a significant mold

3

problem was discovered. Arlington spent $539,594.84 to remediate the mold in the home.

Arlington sued Coldwell Banker and Live Oak for negligence, violations of the DTPA, and negligent misrepresentation. Arlington also sued Coldwell Banker for breach of fiduciary duty and sought attorney's fees from both Coldwell Banker and Live Oak under the DTPA and paragraph 17 of the contract. Arlington sought actual and consequential damages. Live Oak counterclaimed for breach of contract based on its mold inspection proposal.

After an eight-day jury trial in October and November 2009, the jury found Live Oak and Arlington both negligent, with Live Oak bearing 60% of the responsibility. The jury further found that Live Oak had engaged in false, misleading, or deceptive acts, that Arlington had relied on these acts, and that these acts were a producing cause of Arlington's damages (the "DTPA claim"). The jury also found that Live Oak had negligently misrepresented information to Arlington, upon which Arlington justifiably relied, which negligent misrepresentation proximately caused injury to Arlington. The jury found that Coldwell Banker had not breached its fiduciary duty to Arlington and made negative findings on the questions of Coldwell Banker's negligence, negligent misrepresentation and violations of the DTPA. It determined that the reasonable and necessary costs of investigating, remediating, and repairing the mold problems with the property was $539,594.84. The jury found reasonable and necessary attorney's fees for Arlington to be $300,000; for Coldwell Banker to be $150,000; and for Live Oak, $150,000. Finally, the jury determined that Arlington had breached its contract with Live Oak by failing to pay Live Oak's fee for the mold inspection.

Live Oak filed a motion for JNOV in April 2010, to which Arlington responded. The trial court signed a final judgment on October 4, 2010, granting Live Oak's JNOV without stating the basis for its decision and ordering that Arlington take nothing. It further ordered Arlington to pay attorney's fees to Live Oak, as well as the cost of the inspection ($1,080 for inspection and $150,000 for attorney's fees). Finally, the trial

4

court awarded Coldwell Banker attorney's fees of $150,000. This appeal timely followed.

## THE JNOV[1]

Here, Lone Oak moved for JNOV on the following grounds:

- The jury's findings regarding DTPA liability should be disregarded because the DTPA's professional services, over $500,000 transaction, and business consumer exemptions apply, and Arlington did not prove that Live Oak induced it to buy the home.

- The jury's findings concerning negligent misrepresentation liability should be disregarded because Arlington did not prove that (a) Live Oak made a misrepresentation of a material fact and (b) Arlington relied on Live Oak's report in deciding to buy the property.

- The jury's findings of causation should be disregarded because there is no evidence of a proliferation of mold at the time of Live Oak's inspection, the proliferation of mold was discovered months after the inspection, and Live Oak established superseding, intervening causes that Arlington failed to refute.

- The jury's answers to the damages questions should be disregarded because the "economic loss rule" prohibits Arlington from recovering damages in tort, and the testimony concerning Arlington's alleged damages was unreliable.

- The jury's answers to the DTPA and negligent misrepresentation questions should be disregarded because the trial court refused Live Oak's request to include questions regarding apportionment of fault.

- The jury's findings regarding negligence were not supported by any evidence and should be disregarded.

As noted above, the trial court granted Live Oak's JNOV motion without stating the basis.

Arlington responded to Live Oak's JNOV motion by asserting that (a) its DTPA claim is viable because the exemptions relied upon by Live Oak do not apply, and Arlington presented evidence that it purchased the home based on Live Oak's misrepresentations; (b) Arlington presented evidence that Live Oak misrepresented facts upon which Arlington could justifiably rely; (c) Arlington presented evidence that the

---

[1] Coldwell Banker did not move for JNOV because the jury found in its favor. Instead, it moved for entry of judgment, including attorney's fees in the amount found by the jury.

mold was present at the time of the inspection; (d) the economic loss rule does not bar its tort claims; (e) the testimony regarding the remediation process used was reliable, and the witness providing this testimony was qualified; and (f) the remediation process used by Arlington was legal and approved by the Environmental Protection Agency (the "EPA") and the State of Texas. In its first issue on appeal, Arlington alleges that the trial court erred by granting the JNOV. It has broken down its first issue into the following sub-issues:

a. Arlington provided unchallenged testimony from multiple experts that mold existed in the home when it was inspected by Live Oak, and did not arise later. *Did Arlington provide any evidence of causation?*

b. Arlington's claims are based on distinct tort duties, and seek only out-of-pocket remediation costs. *Are Arlington's claims barred by the economic loss rule?*

c. Arlington provided expert evidence that its costs were reasonable, and were incurred after a competitive bidding process. *Was there any evidence that Arlington's remediation costs were reasonable and necessary?*

d. Arlington relied on statements of fact made about a consumer's residence. *Do statutory exemptions bar Arlington's DTPA claims? Was there any evidence that Live Oak induced Arlington to buy the home?*

e. *Was there any evidence of false representations or justifiable reliance to support the jury's finding of negligent misrepresentation?*

f. Expert testimony established that the Sabre mold fumigation process was effective, and that Sabre was properly licensed. *Was there any evidence to support the jury's award of the costs of Sabre remediation as damages?*

g. Live Oak asked the court to apply the jury's answer to Question Two (proportionate responsibility for negligence) to the other claims as well. It did not object to the lack of those other questions. *Was Live Oak entitled to have the answer to Question Two applied to the other causes of action?*

6

**Standard of Review – The JNOV**

We review a JNOV under a no-evidence standard, crediting evidence favoring the jury verdict if reasonable jurors could and disregarding contrary evidence unless reasonable jurors could not. *Tanner v. Nationwide Mut. Fire Ins. Co.*, 289 S.W.3d 828, 830 (Tex. 2009) (citing *City of Keller v. Wilson*, 168 S.W.3d 802, 823 (Tex. 2005)). We may affirm the JNOV only if there is no evidence to support the jury's finding or if the evidence establishes a contrary answer as a matter of law. *Hester v. Friedkin Cos., Inc.*, 132 S.W.3d 100, 105 (Tex. App.—Houston [14th Dist.] 2004, pet. denied). We must uphold the jury's finding if more than a scintilla of competent evidence supports it. *Tanner*, 289 S.W.3d at 830. Ultimately, the test is whether the evidence presented at trial was sufficient for reasonable and fair-minded people to reach the verdict rendered. *Id.* Finally, because the trial court did not state the grounds on which it granted the JNOV, Arlington must refute each of the arguments made in the JNOV motion. *Fort Bend Cty. Drainage Dist. v. Sbrusch*, 818 S.W.2d 392, 394 (Tex. 1991).

Here, the parties do not dispute that Arlington and Live Oak had a contract in which Live Oak agreed to perform a mold inspection. Live Oak performed a mold inspection in substantial compliance with the agreement. However, because a large proliferation of mold was later discovered in the home during a remodeling effort, Arlington became dissatisfied with Live Oak's performance of the contract. Rather than pursuing a breach of contract action, Arlington sued Live Oak for negligence, negligent misrepresentation, and violations of the DTPA. This case requires us to determine whether a party to a contract may ignore its contract remedies in favor of other tort or statutory remedies. Under the unique circumstances presented in this case, we conclude that it may not.

**A.     Arlington's Negligence Claim**

Texas courts have long adhered to the economic loss rule, which generally precludes recovery in tort when the only economic loss to the plaintiff is the subject matter of a contract. *Sw. Bell Tel. Co. v. DeLanney*, 809 S.W.2d 493, 494–95 (Tex.

1991).  Recently, the Texas Supreme Court has clarified that there is not one "economic loss rule," but several rules governing recovery of economic losses in various areas of the law.[2]  *Sharyland Water Supply Corp. v. City of Alton*, 354 S.W.3d 407, 415 (Tex. 2011).  The Court traced the history of the "economic loss rule," examining several situations in which it operated to bar recovery.  *See id.* at 415–18.  Citing *Southwestern Bell Telephone Co. v. DeLanney*,[3] the court reiterated that when a plaintiff seeks damages for breach of a duty created under a contract rather than a duty imposed by law, tort damages are precluded.  *Sharyland*, 354 S.W.3d at 417.  It further explained that the nature of the injury most often determines what duty is breached:  "'When the injury is only the economic loss to the subject of a contract itself the action sounds in contract alone.'"  *Id.* (quoting *DeLanney*, 809 S.W.2d at 495).  The Court refined this concept:

> [W]e have applied the economic loss rule only in cases involving defective products or failure to perform a contract.  In both of those situations, we held that the parties' economic losses were more appropriately addressed through statutory warranty actions or common law breach of contract suits than tort claims.

*Id.*

Here, the subject matter of the contract between Live Oak and Arlington was performance of a mold inspection.  The gravamen of Arlington's tort complaints is that Live Oak negligently performed its contract by failing to adjust the scope of the inspection when it discovered additional information about a previous mold infiltration into the home.  The injury suffered by Arlington is an economic loss to the subject matter of the contract:  a proliferation of mold that should have been discovered by Live Oak during its inspection.

In *DeLanney*, Bell contracted to publish DeLanney's advertisemennt in the Yellow Pages.  When it failed to do so, DeLanney sued Southwestern Bell for negligence.

---

[2] We note that the Court's discussion of the application of the economic loss rule in *Sharyland* involved parties not in contractual privity, as the parties here are.  *See Sharlyland Water Supply Corp. v. City of Alton*, 354 S.W.3d 407, 409–411, 414–15 (Tex. 2011).

[3] 809 S.W.2d 493 (Tex. 1991).

8

*DeLanney*, 809 S.W.2d at 493–94. A jury found in favor of DeLanney on his negligence claim. *Id.* The Texas Supreme Court disagreed, concluding that because Southwestern Bell had breached a duty created by a contract, rather than a duty imposed by law, the claim sounded only in contract. *Id.* at 494–95. Likewise, here, the only duty allegedly breached by Live Oak is a duty created by a contract, rather than any duty imposed by law. Accordingly, because Arlington's negligence claim sounds only in contract, the trial court properly granted Live Oak's JNOV as to Arlington's negligence claims.

## B.      Arlington's Negligent Misrepresentation Claim

In its JNOV motion, Live Oak asserted that it was entitled to judgment as a matter of law on Arlington's negligent misrepresentation claim because there was no evidence that Live Oak made a misrepresentation of a material fact. To recover on its claim for negligent misrepresentation, Arlington had to establish, among other things, that Live Oak supplied false information for the guidance of others. *See McCamish, Martin, Brown & Loeffler v. F.E. Appling Interests*, 991 S.W.2d 787, 791 (Tex. 1999) (describing elements of a negligent misrepresentation claim).

The alleged misrepresentations in this case arise from Martens' email to Young, in which he stated, with regard to the laboratory results:

- "it passed";

- no Stachybotrys ("toxic black mold") or Chaetomium spores;

- "the interpretation of the lab data coupled with the observations made at the time of the inspection indicate no significant mold amplification expected to pose a threat to the subject property or its occupants."

Arlington directs us to nothing in the record suggesting that any of these statements is false. Instead, Arlington relies on the opinions of several witnesses that the mold had to have been present at the time of Live Oak's inspection. First, forensic architect Dan Medley testified that the mold damage was so extensive that, in his professional opinion, mold had been causing the wood beneath the wine and exercise

9

rooms to rot for years. Second, toxicologist Dr. Mike Machen stated that mold was present in such density and over such a wide surface that it had to have been present when Live Oak performed its inspection in September 2005. Finally, industrial hygienist and mold assessment contractor Robert Reda explained that the significant and widespread mold discovered at the residence could not have formed after Live Oak's inspection in September. All three of these experts relied on testing conducted a few months after Live Oak's inspection and the mold damage discovered during Arlington's remodel of the property.

However, it is uncontroverted that Live Oak's laboratory results showed no Stachybotrys or Chaetomium spores at the home when Live Oak conducted its inspection. Thus, there is no credible evidence that Live Oak made a misrepresentation of an existing fact; indeed, the evidence established the contrary as a matter of law. *See Hester*, 132 S.W.3d at 105. Neither Martens' opinion that the home "passed" inspection nor his "interpretation" of his observations coupled with the lab values rises to the level of "existing fact" for purposes of a claim for misrepresentation. *See Transp. Ins. Co. v. Faircloth*, 898 S.W.2d 269, 276–77 (Tex. 1995) (holding that expressions of opinion are not actionable misrepresentations).

Accordingly, JNOV was appropriate on Arlington's negligent misrepresentation claim.

## C. Arlington's DTPA Claim

Arlington asserts that JNOV was improper on its DTPA claim because it proved that Live Oak's misrepresentations induced it to buy the home. To prevail on a claim for failure to disclose under the DTPA, Arlington must have presented evidence of the following: (1) a failure to disclose material information concerning goods or services, (2) which was known at the time of the transaction, (3) if such failure was intended to induce the consumer into a transaction, (4) which the consumer would not have entered had the information been disclosed. *See* Tex. Bus. & Comm. Code Ann. § 17.46(b)(24); *Head v. U.S. Inspect. DFW, Inc.*, 159 S.W.3d 731, 744 (Tex. App.—Fort Worth 2005, no pet.).

First, as discussed above, no misrepresentations of existing facts were made in Martens' email to Young. Second, and as Live Oak argued in its JNOV motion, there is no evidence that any representations it made were intended to induce Arlington to buy the home. *See* Tex. Bus. & Comm. Code Ann. § 17.46(b)(24).

Arlington directs us to the following portion of the record to support its claim that Haress testified he was induced to buy the home because of Live Oak's misrepresentation:

> [Arlington's Attorney] Q. If we scroll to the bottom of this e-mail, and if we can scroll out a little bit: Just received the lab results from the subject property. It passed. No stachybotrys -- toxic black mold -- chaetomium spores. These are the primary indicators of a moisture problem. It says: Interpretation of lab data, coupled with observations made at the time of the inspection, indicate no significant mold amplification expected to pose a threat to the subject property or its occupants.
>
> Do you see that, sir?
>
> [Harres]A. Yes.
>
> Q. Did you get these results before the option period expired?
>
> A. I got the e-mail.
>
> Q. Okay. Now, in this case you've learned some facts about Live Oak's inspection, right?
>
> A. Yes, I guess.
>
> Q. At this stage, could Arlington have backed out of its purchase of the property?
>
> A. I honestly do not believe that we needed to, since it passed. So --
>
> Q. Yeah. And I guess my question is as of this date in time, could Arlington have backed out of its purchase of the property?
>
> A. Yes.
>
> Q. Would Arlington have gotten its earnest money back?
>
> A. Yes.
>
> . . .
>
> Q. After getting this e-mail, did you exercise your option to walk away from this property?
>
> A. No. We signed the option and we transferred the funds.

11

This colloquy establishes that Arlington could have cancelled its purchase of the home and had its earnest money returned at the time Haress read Martens' email. However, nowhere in this record excerpt does Haress indicate that he was induced to purchase the home by the Live Oak email. *See id.*

This court has recently held that there must be direct evidence of the intent to induce under this subsection of the DTPA. *See Red Roof Inns, Inc. v. Jolly*, No. 14-10-00344-CV, 2011 WL 6288147, at *8 (Tex. App.—Houston [14th Dist.] Dec. 15, 2011, no pet. h.). Here, there is simply nothing in our record to indicate that Live Oak intended to induce Arlington into buying the home.

Because Arlington has not directed us to any record evidence that Live Oak intended to induce it to purchase the home, we conclude that the trial court did not err in granting JNOV on Arlington's DTPA claim. Accordingly, we overrule the entirety of Arlington's first issue.

### ATTORNEY'S FEES

In its second issue, Arlington asserts that the trial court erred in awarding attorney's fees to both Live Oak and Coldwell Banker. It breaks this issue into the two following sub-issues:

a.   The sales contract for the home had a clause awarding attorney's fees to a "prevailing party," but Coldwell was not a party. *Did the trial court err by awarding Coldwell its fees?*

b.   Live Oak prevailed on a contract claim that required Live Oak to ask only eight questions in the discovery process. Live Oak refused to segregate its fees for this claim from its fees for defense of Arlington's tort claims. *Did the trial court err by awarding Live Oak its fees?*

We address each of these issues in turn.

### Standard of Review – Award of Attorney's Fee

Texas law prohibits recovery of attorney's fees unless authorized by statute or contract. *Tony Gullo Motors I, L.P. v. Chapa*, 212 S.W.3d 299, 310 (Tex. 2006). If any

12

attorney's fees relate solely to claims for which fees are not recoverable, a claimant must segregate recoverable from unrecoverable fees. *Id.* at 313. "Intertwined facts do not make tort fees recoverable; it is only when discrete legal services advance both a recoverable and unrecoverable claim that they are so intertwined that they need not be segregated." *Id.* at 313–14. Because unsegregated fees are some evidence of what the segregated amount should be, remand for segregation of fees may be required when at least some of the fees at issue are attributable to claims for which attorney's fees are recoverable. *Id.* Arlington's first issue concerns whether Coldwell's fees are recoverable at all, while its second issue revolves around the issue whether Live Oak should have segregated its fees.

## A.      Coldwell Banker's Fees

Coldwell Banker asserts that it is entitled to attorney's fees under the earnest money contract between Arlington and the seller of the home. In its brief, Coldwell Banker discusses the various iterations of the Texas Real Estate Commission's form contracts. Prior to the particular iteration of the contract at issue here, the earnest money contract stated: "If Buyer, Seller, Listing Broker, Other Broker or Escrow Agent is a prevailing party in any legal proceeding brought under or with relation to this contract, such party shall be entitled to recover from the non-prevailing party all costs of such proceeding and reasonable attorney's fees."

The Texas Real Estate Commission form earnest money contract was subsequently changed to provide as follows: "The prevailing party in any legal proceeding brought under or with respect to the transaction described in this contract is entitled to recover from the non-prevailing party all costs of such proceeding and reasonable attorney's fees." This is the language covering attorney's fees in the operative contract. "Party," in turn, is defined by the contract as the buyer and the seller. Coldwell Banker was not listed as a party to the contract and did not sign the contract as a party.

The issue is thus whether the term "party" in the attorney's fees provision is limited to the parties identified and defined by the contract or whether the term includes

persons who were not parties to the contract but who were parties in a legal proceeding related to the agreement. The only parties identified in the contract are the buyer and the seller. In determining intent, we presume that the parties contracted only for themselves and not for the benefit of third parties, unless the obligation to the third party is clearly and fully spelled out. *Tawes v. Barnes*, 340 S.W.3d 419, 425 (Tex. 2011). Nothing in the contract suggests that the parties included the attorney's fees provision for the benefit of persons other than the parties to the contract. Nothing in the contract suggests the buyer and seller intended the word "party" in the attorney's fees provision to include non-parties to the contract. The provision is intended to create a mutual obligation: whichever party loses pays the other party's attorney's fees. There is no evidence that the buyer and seller intended also to obligate themselves unilaterally to pay attorney's fees to persons who, because they were not parties to the contract, would not themselves be obligated under the provision. Absent evidence of such intent, the term "party" should be defined by the terms of the contract itself, which identifies only the buyer and seller as parties.

We recognize that our sister court in Austin has reached a different conclusion on this issue. *See Sierra Assoc. Group, Inc. v. Hardeman*, No. 03-08-00324-CV, 2009 WL 416465, *8–10 (Tex. App.—Austin Feb. 20, 2009, no pet.) (mem. op.). However, our position is supported by opinions from our sister courts in San Antonio and Beaumont, whose reasoning we find to be more persuasive. *See Lesieur v. Fryar*, 325 S.W.3d 242, 251–253 (Tex. App.—San Antonio 2010, pet. denied); *Williamson v. Guynes*, No. 10-03-0047-CV, 2005 WL 675512, *1 (Tex. App.—Waco Mar. 23, 2005, no pet.). Thus we hold that Coldwell Banker was not entitled to recover attorney's fees under the terms of the earnest money contract. Because Coldwell Banker has identified no other basis for recovery of attorney's fees, we sustain Arlington's second issue in part.

## B.    Live Oak's Fees

Arlington next asserts that Live Oak's attorney's fees should have been segregated between fees incurred prosecuting its breach of contract claim, which are recoverable,

and fees incurred in defending against Arlington's tort and DTPA claims, which are not. Live Oak counters that "public policy supports Live Oak receiving its right to recover fees without segregating them because in effect Live Oak was defending against jury nullification [by Arlington having asserted an affirmative defense to Live Oak's breach of contract claim]." We must disagree. Even if Arlington had asserted an affirmative defense to Live Oak's breach of contract claim, Live Oak would still be required to segregate its fees in this case: "it is only when discrete legal services advance both a recoverable and unrecoverable claim that they are so intertwined that they need not be segregated." *Tony Gullo Motors I*, 212 S.W.3d at 313–14. Live Oak has not established that discrete legal services advancing both recoverable and unrecoverable claims were provided in this case. Absent such a showing, Live Oak was required to segregate its fees. *See id.*; *see also Rapid Settlements, Ltd. v. Settlement Funding, LLC*, No. 14-09-00637-CV, 2010 WL 3604182, at \*4–5 (Tex. App.—Houston [14th Dist.] Sept. 9, 2010, no pet.) (mem. op.) Accordingly, we sustain this portion of Arlington's second issue.

## CONCLUSION

We have overruled Arlington's first issue in its entirety and conclude that Live Oak was entitled to judgment notwithstanding the verdict on all of Arlington's claims. However, we have sustained Arlington's second issue. Because Coldwell Banker was not entitled to attorney's fees under the earnest money contract, we reverse the trial court's award of attorney's fees to Coldwell Banker and render judgment that Coldwell Banker take nothing. But because Live Oak's unsegregated attorney's fees are some

15

evidence of its segregated fees,[4] we reverse and remand to the trial court for determination of Live Oak's appropriate segregated attorney's fees.

/s/      Adele Hedges
         Chief Justice

Panel consists of Chief Justice Hedges and Justices Christopher and McCally (Christopher, J., dissenting).

---

[4] *See Tony Gullo Motors I*, 212 S.W.3d. at 314.