**Affirmed and Opinion filed August 4, 2015.**



In The

# Fourteenth Court of Appeals

## NO. 14-13-00117-CV

**MEMC PASADENA, INC., Appellant**

**V.**

**RIDDLE POWER, LLC AND TRIAD ELECTRIC AND CONTROLS, INC.,**
**Appellees**

**On Appeal from the 151st District Court**
**Harris County, Texas**
**Trial Court Cause No. 2008-11010**

## O P I N I O N

Appellant MEMC Pasadena, Inc., sustained damages after an electrical accident at its industrial plant caused a shutdown and loss of production. MEMC sued its electrical contractor, Triad Electric and Controls, Inc., and Triad's subcontractor, Riddle Power, LLC, alleging that Triad breached its contract with MEMC and that both Triad and Riddle were negligent. Following a jury trial, the trial court signed a judgment awarding MEMC damages against Riddle and a take-nothing judgment for Triad. On

appeal, MEMC raises twenty-two issues, challenging the legal and factual sufficiency of the evidence and the jury charge. For the reasons explained below, we affirm.

### FACTUAL AND PROCEDURAL BACKGROUND

MEMC owns and operates an industrial plant in Pasadena, Texas, where it manufactures granular polysilicon.[1] Granular polysilicon can be made into silicon wafers for use in the semiconductor and solar industries. Much of the polysilicon MEMC produced was transferred to separate corporations related to MEMC's parent company to be made into silicon wafers, and some was transferred to MEMC Singapore or elsewhere for sale. MEMC would sell any remaining polysilicon on the spot market for a profit.

To increase plant capacity for polysilicon production, MEMC undertook an expansion project known as the P-23 project. MEMC hired CDI Business Solutions, Inc., to oversee and perform the engineering, procurement, and construction management services for the project. CDI also served as MEMC's "agent for construction on-site." MEMC delegated the day-to-day project work to CDI and gave CDI authority to manage the project and contractors. MEMC also authorized CDI to act as its agent during the bid process and to compile bid packages, send the bid packages to prospective contractors, analyze the bids, and prepare recommendations.

On November 22, 2006, CDI extended a Request for Proposal ("RFP") to prospective electrical and instrumentation contractors, including Triad. The RFP was for a time and materials ("T&M") project, and it included numerous documents, including a form contract, a description of the scope of work, and commercial terms. Also included were standard terms and conditions prepared by CDI with MEMC's approval (the "CDI

---

[1] For convenience and unless otherwise specified, references to MEMC will mean MEMC Pasadena, Inc. and not its parent company, MEMC Electronic Materials, Inc., which was not a party to the lawsuit.

T&Cs"). It also provided instructions the bidders were to follow if they disagreed with any of the terms and conditions. The RFP required the bidder to "except" (i.e., object) to those terms and provide alternate language for review on Proposal Form 11. MEMC notified the bidders that exceptions would be "highly discouraged" and would be taken into consideration when evaluating a bidder's overall proposal. Fully completed bids were to be mailed by overnight express to be received by CDI on or before 11:00 a.m. on December 18, 2006.

After issuing the RFP, CDI provided supplemental information and terms to the bidders by addendum. An addendum became part of the RFP package, and if a bidder did not object to the addendum, it became part of the bidder's response to the RFP. Each addendum issued was numbered sequentially, and the addenda were transmitted by email to all of the bidders at the same time. Most of the addenda are not germane to the case.

On November 29, 2006, CDI forwarded "Addendum 3" containing several blank, standardized documents, including a form MEMC purchase agreement for goods and services instead of a T&M contract. The MEMC purchase agreement also contained standard terms and conditions that differed from the CDI T&Cs in the RFP (the "Addendum 3 T&Cs"). The Addendum 3 T&Cs included a provision making the contractor responsible for any consequential damages.

On December 8, 2006, Triad submitted an exception to the indemnity, insurance, and lien provisions of the CDI T&Cs. Triad did not except to anything in Addendum 3.

Shortly before the bid deadline, CDI emailed "Addendum 9" to Triad and the other bidders. Addendum 9 provided for a mutual waiver of consequential damages:

> Neither party shall be liable to the other for consequential, indirect, incidental, or special damages including but not limited to loss of plant capacity, loss of business or any other such lost, howsoever caused,

3

including by the negligence or strict liability of either party.

Mike Woody at Triad received Addendum 9 before the bid deadline and brought it to the attention of Philip Morgan, Triad's general manager, who was preparing Triad's bid. After reviewing Addendum 9, Triad submitted its bid in response to the RFP without excepting to Addendum 9 on Proposal Form 11 or otherwise informing MEMC that it objected to the mutual waiver of consequential damages. Triad emailed its bid by the deadline, and supplemented its bid with additional information the next day.

CDI analyzed the bids and recommended Triad for the project. MEMC's project procurement leader, Jerry Jones, awarded the contract to Triad in January 2007. MEMC subsequently issued a purchase order for the project. The purchase order erroneously identified "Performance Contractors" as the contractor. The purchase order also contained form language that "MEMC's Purchase Order Terms and Conditions are part of this agreement" and available online at MEMC's website (the "online T&Cs").

Because some confusion arose over the applicable terms and conditions, Triad contacted Jones. On January 24, 2007, Jones sent correspondence to Triad's project manager, Ryan Trueblood, informing Triad that "[f]or the purpose of the contract, CDI T&C's will govern." Neither Jones nor Trueblood testified at trial. Triad understood that the "CDI T&C's" included the terms Triad received in the original RFP and subsequent addenda.

On January 31, 2007, MEMC sent Triad a revised purchase order correcting the name of the contracting party (the "PO"). Although the PO contained the same form language making MEMC's online T&Cs part of the agreement, MEMC inserted this typewritten statement: "PO CHANGE NOTICE 1/31/07 • TERMS & CONDITIONS AMENDED AS REQUESTED – JJONES." The PO also specified that the basis of the T&M purchase order was Triad's response to the RFP and "subsequent correspondence from Triad on accepted clarifications." Additionally, the PO instructed that the scope of

4

work at the site was "under the direction of" CDI, that CDI "will communicate all engineering, construction and specification documents for this work," and that CDI "will administer this work by authority of" MEMC. This PO and the incorporated correspondence formed the contract between MEMC and Triad.

By August 2007, the project was behind schedule. To avoid having to shut down plant production, MEMC made the decision to have the electrical work performed without de-energizing a 2,400-volt transformer known as T-45. Electrical work done near or with energized electrical equipment is known as "close proximity" or "hot" work. Triad declined CDI's request to do the work inside of T-45 because it did not perform hot work, so CDI asked Triad to hire Riddle, a high-voltage specialist, as a subcontractor to handle the job.

Riddle quoted a price of $6,500 for the job. Riddle's superintendent, Charlie Holden, went out to the site before the work was to begin. He noted that the transformer box lacked three protective barriers or "deflector panels" between the part of the transformer that was energized and the part that was not, and requested they be installed. In the scope of work CDI prepared for Riddle, CDI noted that Riddle believed that the work was feasible, but that "[c]ertain added protective barriers" would need to be installed before Riddle began work. Only two of the three barriers were installed, however, leaving the bottom section open.

On August 27, 2007, the day before the accident, Riddle's crew arrived at MEMC's plant, pulled permits, and barricaded their work area with red warning tape. Holden saw that two of the deflector plates were present, but could not confirm the third had been installed without putting his hand inside the transformer box, which he declined to do. Riddle's crew then began the process of pulling cable through the conduit at T-45 and terminating the cable at the switchgear inside the transformer box. Because Riddle's supervisor, Kevin Hines, did not have a non-conductive fiberglass

5

fishing tool, he borrowed a metal fish tape from Triad. Using that metal fish tape, Riddle's crew pulled one cable without incident.

The next morning, Riddle's crew returned to the plant to pull additional cable underneath the switchgear at T-45. During the course of Riddle's work, MEMC personnel crossed the barricades Riddle had placed around the work site to complete some switching, interrupting Riddle's work. Shortly thereafter, Hines had a disagreement with one of his co-employees, Gene Chesson, about how to pull the cable. Hines instructed Chesson to push the fish tape toward the energized switchgear as they had done the day before. Chesson walked around behind the switchgear, without communicating with Hines, and began pushing the fish tape toward the transformer. Unbeknownst to Chesson, Hines was helping a Triad employee with measurements and so was not in position and ready to intercept the fish tape before it reached the energized portion of the transformer. As Chesson pushed the metal fish tape through the conduit, it made contact with the energized "bus" inside the transformer box, causing an explosion and flash. As a result, the system shorted out and shut down the plant. No personnel were injured.

After the incident, Holden arrived at the plant and saw that the fish tape had contacted the energized bus at the transformer box. Holden also saw that the third protective barrier plate, which would have prevented the fish tape from coming into contact with the energized portion of the transformer, had not been installed.

Power was restored to the plant the next morning, and representatives from MEMC, CDI, Triad, and Riddle met to discuss the accident. Everyone at the meeting took some responsibility for the accident and acknowledged there were things they could have done differently. Ultimately, an incident investigation report identified seven contributing causes of the accident, including causes attributable to Riddle, Triad, MEMC, and CDI.

The power outage temporarily impacted MEMC's ability to produce polysilicon. To assess Triad's potential responsibility for any lost production MEMC asked CDI's construction manager, Randy Cline, to advise MEMC on "Triad's financial liability for this production outage under the terms of the construction agreement." Although the record does not contain Cline's response to MEMC, in a response to an email from Trueblood at Triad concerning costs related to "down time," Cline stated: "Consequential damages – so MEMC eats."

MEMC sued Riddle and Triad for negligence and also asserted a breach of contract claim against Triad. At trial, MEMC sought consequential damages for lost production of 77.2 metric tons of product, which MEMC valued at over $23 million. Although Riddle readily acknowledged some responsibility for the incident, both Triad and Riddle argued that CDI was also negligent and that CDI's negligent acts or omissions were attributable to MEMC because CDI was MEMC's agent. Additionally, Triad denied it breached its contract with MEMC, and the parties disputed whether MEMC's online T&Cs were part of the contract. Central to the issue of whether Triad would be liable for any consequential damages, MEMC and Triad also disputed whether CDI was authorized to send Addendum 9 on MEMC's behalf, and whether Addendum 9 was ever part of MEMC's contract with Triad. Triad and Riddle also challenged MEMC's damages calculations.

After a three-week jury trial, the jury found that the negligence of Riddle, Triad, and MEMC proximately caused the occurrence and injury in question and attributed the percentage of responsibility to Riddle, Triad, and MEMC at 30%, 30%, and 40%, respectively. [2] The jury found that MEMC incurred lost profits of $300,000. As to MEMC's contract claim against Triad, the jury found that Triad did not comply with

---

[2] The court's charge instructed the jury that when considering whether any negligence of MEMC proximately caused the occurrence in question, "any acts or omission of CDI in the construction phase of the project[] are included in the acts of MEMC."

some provisions of the contract, but concluded that MEMC suffered zero damages. Additionally, the jury found that CDI had actual or apparent authority from MEMC to send Addendum 9 to the bidders, MEMC and Triad agreed to include Addendum 9 in their contract, and MEMC was estopped from claiming that Addendum 9 was not part of its contract with Triad.

Consistent with the jury's verdict, the trial court rendered judgment that MEMC recover $90,000.00 in damages from Riddle ($300,000 x Riddle's 30% responsibility), plus interest and court costs. The trial court also rendered judgment that MEMC take nothing from Triad.

### OVERVIEW OF MEMC'S ISSUES

MEMC raises twenty-two issues challenging the legal and factual sufficiency of the evidence supporting the jury's verdict and the court's charge. MEMC discusses its evidentiary and charge error issues relating to its contract claim against Triad within the following three broad categories: (1) what was the agreement between MEMC and Triad?; (2) evidence and charge error regarding CDI questions; and (3) evidence and charge error as to breach/damages. MEMC discusses the evidentiary and charge error issues relating to its negligence claim within five broad categories containing several sub-issues: (1) lack of evidence of MEMC's negligence; (2) lack of evidence of CDI's negligence; (3) lack of comparative responsibility; (4) charge error concerning MEMC's negligence; (5) Triad's right of control – evidence and charge; and (6) errors regarding MEMC's damages. Because MEMC's evidentiary and charge issues are interwoven in its briefing, we will address the issues in the order and as necessary to resolve the appeal. We will first address MEMC's breach of contract and negligence claims against Triad. Next, we will consider MEMC's negligence claims and comparative responsibility.

**Standards of Review**

When reviewing the legal sufficiency of the evidence, we review the evidence in the light most favorable to the jury's findings and assume that the jury resolved all conflicts in accordance with its judgment. *City of Keller v. Wilson*, 168 S.W.3d 802, 820 (Tex. 2005). We credit favorable evidence if reasonable jurors could do so, and we disregard contrary evidence unless reasonable jurors could not do so. *Id.* at 827. Evidence is legally insufficient if: (1) there is a complete absence of evidence of a vital fact; (2) the court is barred by rules of law or evidence from giving weight to the only evidence offered to prove a vital fact; (3) the evidence offered to prove a vital fact is no more than a mere scintilla; or (4) the evidence establishes conclusively the opposite of the vital fact. *Id.* at 810. The ultimate test is whether the evidence at trial would enable reasonable and fair-minded people to reach the answer under review. *Id.* at 827.

When reviewing the factual sufficiency of the evidence, we must consider and weigh all the evidence. *Ortiz v. Jones*, 917 S.W.2d 770, 772 (Tex. 1996) (per curiam). Findings may be overturned only if they are so against the great weight and preponderance of the evidence as to be clearly wrong and unjust. *Id.* Under both standards of review, the factfinder is the sole judge of the witnesses' testimony as well as the weight to be given to their testimony. *City of Keller*, 168 S.W.3d at 819; *GTE Mobilnet of S. Tex. Ltd. P'ship v. Pascouet*, 61 S.W.3d 599, 615–16 (Tex. App.— Houston [14th Dist.] 2001, pet. denied).

A party is entitled to a jury question, instruction, or definition if the pleadings and evidence raise an issue. Tex. R. Civ. P. 278. If there is some evidence to support the submission, the trial court commits reversible error if it fails to submit the instruction. *4901 Main, Inc. v. TAS Auto., Inc.*, 187 S.W.3d 627, 631 (Tex. App.— Houston [14th Dist.] 2006, no pet.). We review a trial court's decision to refuse a

particular jury question or instruction for abuse of discretion. *See Shupe v. Lingafelter*, 192 S.W.3d 577, 579 (Tex. 2006) (per curiam). A trial court's error in refusing an instruction is reversible if it either "probably caused the rendition of an improper judgment" or "probably prevented the appellant from properly presenting the case to the court of appeals." Tex. R. App. P. 44.1(a).

## I. MEMC's Contract and Negligence Claims against Triad

## A. The Contract Issues

The trial court submitted eight questions dealing with MEMC's breach of contract claim. The jury found that Triad breached its contract with MEMC, but that the contract included a waiver of any consequential damages and awarded no damages. MEMC describes the "overarching issue" dominating the trial as whether the parties agreed to Addendum 9's mutual waiver of liability for consequential damages as Triad claimed.

### 1. *Issue 11: Sufficiency of Evidence to Support Question 11*

In Issue 11, MEMC argues that there is no evidence to support the jury's finding in Question 11 that MEMC and Triad expressly agreed to make Addendum 9 part of their contract, and no or insufficient evidence of an implied agreement to make Addendum 9 part of the contract. We conclude that, although the parties offered conflicting versions of the circumstances surrounding Addendum 9 and each party points to evidence favorable to its position, legally and factually sufficient evidence was presented to support the jury's finding that MEMC and Triad agreed to include Addendum 9 in their contract.

MEMC first argues that there is no evidence to support the jury's finding that MEMC and Triad expressly agreed to make Addendum 9 part of their contract. MEMC contends that no evidence of an express agreement exists because CDI had no authority to negotiate the contract; there is no evidence of any contract negotiations or an express

agreement between MEMC and Triad to include Addendum 9; and the face of the contract is silent as to Addendum 9.

MEMC acknowledges in its brief that "CDI acted as MEMC's agent in the RFP process to handle the bids." CDI's cover letter for the RFP also reflected that CDI was "acting as agents for the MEMC P-23 Project in Pasadena, TX." Russ Miscow, CDI's contract manager, testified that CDI handled the bid process and made recommendations for MEMC. CDI did not negotiate or enter into contracts with subcontractors for MEMC, however, and CDI never received a copy of the final contract between MEMC and Triad.

Miscow explained that CDI communicated bid information to potential subcontractors by email, and he confirmed that CDI's contract administrator, Julissa Hernandez, sent Addendum 9 to the bidders. According to Miscow, Addendum 9 would "absolutely not" have been sent without MEMC's approval. Miscow also testified that Addendum 9 became part of the terms and conditions of the project, and Triad would have been obligated to bid in accordance with those terms and conditions.

Hernandez likewise testified that CDI would not send out correspondence on the project without MEMC first approving it. She also stated that MEMC gave written approval, by email, for CDI to send the RFP and all nine of the addenda to the bidders. As the RFP provided, and Hernandez further explained, bidders were required to put any exceptions to the proposed terms and condition in their December 18 proposal; if a bidder did not object to Addendum 9 (or any other proposed term), it became part of the contract's terms and conditions; Triad never objected to Addendum 9; and Addendum 9 became part of Triad's response to the RFP. Phillip Morgan of Triad also confirmed that Triad received and reviewed Addendum 9 before the bid deadline and that Triad proceeded with its bid without submitting an exception to Addendum 9.

As MEMC points out, both Miscow and Hernandez testified that any contract

11

would be negotiated between MEMC and Triad. And after Triad was selected, there is some evidence that Trueblood of Triad communicated with Jones of MEMC concerning alterations or clarifications to the final agreement, but neither testified at trial. MEMC also argues that the PO makes no mention of Addendum 9, and asserts that Addendum 9 was not mentioned until after the accident when Randy Cline of CDI showed Trueblood a copy.[3] However, Doug Rice, MEMC's corporate representative, acknowledged that Addendum 9 was emailed and received by Triad before the bid deadline. Rice also testified that Triad "adopted" Triad's response to the RFP as part of the contract. Moreover, the PO on its face expressly incorporates Triad's response to the RFP as the basis for the purchase order.

Because the bid process required that negotiations concerning the proposed contract's terms and conditions be conveyed only by email communication with CDI, and any terms and conditions not objected to by the bidder became part of the agreement between the parties, the jury could have reasonably concluded that Addendum 9 became part of the parties' contract because CDI issued Addendum 9 on behalf of MEMC and Triad did not object to its inclusion. On these facts, the evidence is legally sufficient to support the jury's finding that MEMC and Triad agreed to Addendum 9.

MEMC next contends that there is factually insufficient evidence of an implied agreement to make Addendum 9 part of the contract. First, MEMC argues that Addendum 3, including the Addendum 3 T&Cs making Triad responsible for MEMC's consequential damages, superseded the RFP and prior addenda. MEMC posits that if MEMC authorized sending Addendum 9 (as Triad contends), then Addendum 9

---

[3] Documentary evidence shows that on September 10, 2007, Trueblood emailed Miscow, stating that he "had never received an addendum 9" and only had addendums "through number 4." Trueblood requested that Miscow email a current copy of the agreement with all of the addendums, and in response Miscow forwarded "addendums 5-9 as requested."

"modified" the Addendum 3 T&Cs, rather than the CDI T&Cs; therefore, Triad's argument that the CDI T&Cs are controlling impliedly rejects Addendum 9. MEMC also contends that Triad's version of events implausibly suggests that Triad was able to obtain CDI's consent to send its bid by email instead of overnight mail without documentation, violate the bid process, and choose to ignore Addendum 3 and instead bid against the superseded CDI T&Cs.

MEMC is correct that Triad's position is that it was bidding against the RFP containing the CDI T&Cs and the subsequent addenda, as Morgan testified. But there was also evidence that Triad correctly relied on the CDI T&Cs because the MEMC goods and services contract (containing the Addendum 3 T&Cs) was mistakenly included in Addendum 3. The contract was prepared by MEMC and was a different type of contract than the proposed electrical and instrumentation contract prepared by CDI and presented in the RFP. The agreement also specified that the "buyer" was MEMC Electronic Materials, Inc., not MEMC Pasadena, Inc. When shown Addendum 3, Miscow expressed surprise that a goods and services contract was sent to the bidders, because he thought that the standard terms and conditions went out with the RFP. Hernandez testified that, although MEMC instructed her to send Addendum 3, she believed MEMC sent the goods and services agreement in error. Based on this evidence, the jury reasonably could have rejected MEMC's version of events and accepted Miscow's and Hernandez's testimony that MEMC sent the goods and services agreement in Addendum 3 by mistake. And although MEMC contends that Triad bid against the wrong T&Cs, the PO reflects that MEMC expressly adopted Triad's response to the RFP as the basis of the PO.

Even if the jury believed Addendum 3 superseded the original RFP, the jury could have concluded that Addendum 9 modified Addendum 3—as MEMC's own argument recognizes—to provide for the mutual waiver of consequential damages.

13

Further, to the extent that MEMC argues that Triad acted improperly in the bid process, Miscow testified that if a bidder does not follow the bid instructions, they could be disqualified, and it was MEMC's decision whether to disqualify the bidder. Because MEMC chose Triad as the winning bidder, the jury could have concluded that MEMC chose to overlook any noncompliance with the bid process on Triad's part.

MEMC also makes a related argument that Addendum 9 cannot be incorporated in the contract using Jones's email informing Triad that "the CDI T&C's will govern" and "isolated phrases" from the PO. In this argument, MEMC contends that "PO CHANGE NOTICE 1/31/07 • TERMS & CONDITIONS AMENDED AS REQUESTED – JJONES" on the face of the PO is too vague to clearly mean that the CDI T&Cs were adopted by the parties, much less that they incorporated Addendum 9 into their contract. According to MEMC, Jones could have been referring to the PO's correction of the subcontractor's name in the original purchase order, or "most likely" was referring to Triad's December 8, 2006, written exceptions to MEMC's indemnity, lien, and insurance requirements. MEMC also notes that the PO references a date of "1/31/07," while Jones's email is dated January 24, 2007, and there is no evidence from the emails or testimony that Triad "requested" the CDI T&Cs.[4]

The limited documentary evidence of post-award communications between Jones and Trueblood shows that on January 15, 2007, Jones informed Miscow and others that he called Trueblood and "verbally awarded the business" to Triad. Jones also explained

---

[4] MEMC also contends that Morgan's testimony that Triad "concluded" that Jones was referring to the CDI T&Cs from the RFP in his email is not evidence that the parties agreed to include Addendum 9, because the court instructed the jury to consider only what the parties said and did, and not their "unexpressed thoughts or intentions." MEMC further suggests that Jones's email "impermissibly varies and adds to the terms on the face of the PO Contract." We note that the jury was instructed to consider what the parties said and did "in light of the surrounding circumstances." MEMC's own argument concerning what Jones intended to convey at most raises a fact issue the jury was entitled to resolve in Triad's favor. *See City of Keller*, 168 S.W.3d at 820.

that Trueblood was "completing required documents" for Jones and that the PO would be issued after Trueblood returned the documents to him. That same day, Jones emailed Trueblood requesting that Trueblood complete and return the documents. Trueblood forwarded some of the documents to Jones on January 22 and the rest on January 23. The documents returned were some of the form MEMC documents that had been transmitted with Addendum 3.

On January 22, 2007, Trueblood also emailed Jones, copied to Cline, Miscow, and Morgan, concerning "a few things with the purchase agreement that Triad would like to address." Trueblood listed three bullet points requesting proposed revisions to certain sections of the Addendum 3 T&Cs from Addendum 3. The third point specifically requested that MEMC change the payment terms to be consistent with those in the RFP prepared by CDI.

Cline responded to Trueblood's email on January 23, and the next email in the chain is Jones's January 24 email in which he replied to Trueblood, "I understand there is confusion over the conflicting T&C's presented by CDI and MEMC. For the purpose of this contract, CDI T&C's will govern." On January 25, 2007, MEMC forwarded the first purchase order, dated 1/24/2007, misnaming Triad as Performance Contractors.[5] Triad requested a correction, and the corrected PO, also dated 1/24/2007, was faxed on January 31.

From this evidence, the jury could have concluded that the confusion Jones was addressing in his email was Triad's confusion over whether the CDI T&Cs or the Addendum 3 T&Cs governed the parties' contractual relationship. The jury also could have concluded that Jones's statement on the face of the PO was memorializing his

---

[5] The incorrect purchase order also provided that the basis of the PO was Triad's response to CDI's RFP "issued 9/21/06, and subsequent correspondence from Triad on accepted clarifications," which may have further added to Triad's confusion over which set of terms and conditions would govern.

earlier email clarification that the CDI T&Cs would govern. As for the time lag between January 24 and January 31, the incorrect purchase order was sent to Triad during that time and Triad requested it be corrected. The jury could have concluded that Jones merely added the change notice language on January 31, the date the corrected PO was faxed. Jones's typewritten notation is also consistent with other language on the face of the PO that the basis of the PO was Triad's response to the RFP, meaning the CDI T&Cs and all addenda, including Addendum 9.

We conclude that this evidence is legally and factually sufficient to support the jury's finding that MEMC and Triad agreed that the CDI T&Cs and subsequent addenda, including Addendum 9, applied to their contract. We overrule MEMC's Issue 11.

### 2. *Issues 12 and 13: Whether MEMC's Online Terms and Conditions Applied as a Matter of Law*

In Issue 12, MEMC contends that the trial court committed reversible error by refusing to grant MEMC a directed verdict that its online T&Cs applied to the parties' contract, and by submitting a question of contract construction to the jury in Question 6. In Issue 13, MEMC contends that the evidence is legally and factually insufficient to support the jury's answer to Question 6.

Question 6 asked: "Did MEMC and Triad agree that MEMC's Online Terms and Conditions (T's & C's) (MEMC Exhibit 12) were part of the contract between them?" The jury also was instructed as follows:

> In deciding whether the parties agreed that MEMC's Online Terms and Conditions (T's & C's) were part of the contract between them, you may consider what they said and did in light of the surrounding circumstances. You may not consider the parties' unexpressed thoughts or intentions.

The jury answered "no."

16

In reviewing a directed verdict, we decide whether there is any evidence of probative value to raise an issue of material fact on the question presented. *Exxon Corp. v. Emerald Oil & Gas Co., L.C.*, 348 S.W.3d 194, 217 (Tex. 2011). We review the evidence in the light most favorable to the party suffering the adverse judgment. *Id.*

MEMC points to the form language on the face of the PO that MEMC's online T&Cs were part of the agreement and "[a]ny additional or different terms proposed by vendor to this purchase order are rejected unless expressly agreed to by MEMC in writing."[6] MEMC notes that this language was not stricken out. MEMC also argues that Jones's typewritten notation "PO CHANGE NOTICE 1/31/07 • TERMS & CONDITIONS AMENDED AS REQUESTED – JJONES" did not state that MEMC's online T&Cs were "replaced" or that CDI's T&Cs "were adopted," which it contends would have been consistent with Triad's theory. Instead, MEMC argues, Jones's use of the word "amended" is consistent with MEMC's argument that Jones was referring to the agreement to use Triad's indemnity, insurance, and lien provisions.

As previously discussed in Issue 11, Jones's typewritten notation on the PO and the surrounding circumstances raised a fact issue concerning which set of terms and conditions the parties intended to apply to their contract. Indeed, the issue was hotly contested and ultimately resolved in Triad's favor. This is not a situation in which the trial court ceded its duty to construe the terms of an unambiguous contract, as MEMC contends. Because some evidence supports the trial court's submission of the issue, the trial court did not err by denying MEMC's motion for directed verdict and submitting the issue to the jury. Additionally, the evidence is factually sufficient to support the jury's answer to Question 6. We overrule MEMC's Issues 12 and 13.

---

[6] Additionally, although MEMC contends that its online T&Cs were available at the time, MEMC's witnesses testified that they did not know whether the online terms and conditions were available online, and Morgan testified that he looked for them in 2007, but did not find them.

### 3.    *Issue 14: Charge Error as to Question 6*

In Issue 14, MEMC contends that the trial court reversibly erred by submitting Question 6 to the jury over MEMC's objection and by refusing MEMC's tender of a proper question and instruction which would have asked the jury to determine which set of terms and conditions applied to the contract between the parties. Absent such a finding, MEMC argues, the jury's answer to Question 6 was immaterial.

The gist of MEMC's argument appears to be that there were three sets of terms and conditions in evidence—the CDI T&Cs, the Addendum 3 T&Cs, and MEMC's online T&Cs—and the jury was required to choose between them. Because Triad bore the burden to prove Addendum 9 applied, MEMC argues, it was not enough for the jury merely to reject MEMC's online T&Cs; the jury also should have been asked whether the parties agreed to the CDI T&Cs. Thus, MEMC concludes, by refusing to submit a choice, any answer was immaterial since it did not decide which set of terms and conditions applied.

As an initial matter, MEMC's objection below and proposed question does not comport with its appellate argument, because it does not include the Addendum 3 T&Cs as an option for the jury to choose. MEMC's proposed question asked the jury to choose between the CDI T&Cs and MEMC's online T&Cs, but did not offer the jury the option to choose the Addendum 3 T&Cs.[7] Therefore, MEMC has not preserved the issue for review. *See Bayer Corp. v. DX Terminals, Ltd.*, 214 S.W.3d 586, 602–03 (Tex. App.—Houston [14th Dist.] 2006, pet. denied.).

Additionally, the particular terms contained within the identified pages of CDI's

---

[7] Specifically, MEMC's proposed question asked the jury to choose either "(a) CDI Terms and Conditions marked as pages 1 through 27 contained within the RFP dated November 22, 2006 (MEMC exhibit 13)," or "(b) the online MEMC Purchase Order Terms and Conditions (MEMC exhibit 12)." MEMC may have intended to refer to MEMC exhibit 14, the contents of the RFP, because MEMC exhibit 13 consists of a one-page cover letter on CDI's letterhead.

T&Cs were immaterial to any of the claims or defenses raised in the lawsuit. A trial court is required to "submit only controlling factual issues which are essential to a right of action or defense." *Indian Oil Co., LLC v. Bishop Petroleum Inc.*, 406 S.W.3d 644, 658 (Tex. App.—Houston [14th Dist.] 2013, pet. denied). Therefore, the trial court did not err by refusing to submit MEMC's proposed question. Instead, the trial court correctly submitted two questions on the controlling contract formation issues—whether the parties agreed to the material contractual provisions that were in dispute: (1) MEMC's online T&Cs and (2) Addendum 9. We overrule MEMC's Issue 14.

### 4. Issue 15: Sufficiency of Evidence of Actual or Apparent Authority

In Issue 15, MEMC argues that the evidence is legally and factually insufficient to support the jury's finding in Question 10 that CDI had actual or apparent authority to send Addendum 9 to the bidders.

Question 10 included the following definitions of "authority" and "apparent authority":

> *Authority* for another to act for a party must arise from the party's agreement that the other act on behalf of and for the benefit of the party. If a party so authorizes another to perform an act, that other party is also authorized to do whatever else is proper, usual, and necessary to perform the act expressly authorized.

> *Apparent authority* exists if a party (1) knowingly permits another to hold itself out as having authority or, (2) through lack of ordinary care, bestows on another such indications of authority that lead a reasonably prudent person to rely on the apparent existence of authority to his detriment. Only the acts of the party sought to be charged with the responsibility for the conduct of another may be considered in determining whether apparent authority exists.

First, MEMC argues that the evidence is legally and factually insufficient to show actual authority because MEMC had never seen Addendum 9 until after the litigation

19

was underway, and Miscow testified that he had no recollection of it. Further, Hernandez testified that there would be a record of MEMC's email approving it, but there was none. Second, MEMC argues that the evidence is insufficient to show apparent authority because Triad relied solely on the testimony of an interested witness, Morgan, to prove Triad's reliance on Addendum 9. According to MEMC, Morgan's testimony that he received oral permission from Cline to email Triad's bid could not be readily controverted because Cline did not testify, and Morgan's assertion was not credible since CDI communicated with Triad by addenda and there was no supporting documentation of a waiver.

MEMC's arguments ignore Miscow and Hernandez's testimony, discussed in greater detail in Issue 11, that Addendum 9 was sent with MEMC's approval, as were all other addenda to the RFP, and would not have been sent without MEMC's permission. Additionally, the cover letter for the bid package reflected that CDI was "acting as agents for the MEMC P-23 Project in Pasadena, TX." MEMC's corporate representative, Doug Rice, acknowledged that CDI sent the bid package to Triad with MEMC's authority, and that Triad had the right to believe that when it was talking with CDI during the bid process it was essentially dealing with MEMC. Moreover, the jury could have believed Morgan and discounted Rice's testimony that MEMC knew nothing of Addendum 9, because Rice was not the person responsible for putting together the contract—that person was Jones, who did not testify. The jurors, as the sole judges of the credibility of the witnesses, were free to resolve any conflicts in the parties' testimony in accordance with the verdict. *See City of Keller*, 168 S.W.3d at 819–20. We overrule MEMC's Issue 15.

### 5.    *Issue 16: Charge Error as to Question 10*

In Issue 16, MEMC argues that Question 10 should not have been submitted in light of the lack of evidence the parties explicitly or impliedly agreed to include

Addendum 9 in their contract, and that without such evidence, the question is irrelevant and immaterial. *See Salinas v. Rafati*, 948 S.W.2d 286, 288 (Tex. 1997) ("A jury finding is immaterial only if the question should not have been submitted or if the question, though properly submitted, was rendered immaterial by other findings."). Because we have determined that sufficient evidence supports the jury's answer to Question 10, as discussed above in Issue 15, we overrule MEMC's Issue 16.

### 6. Issue 17: Refusal of Limiting Instruction as to CDI

In Issue 17, MEMC contends that the trial court erred by refusing MEMC's request that the jury be instructed to "not consider any statement or conduct of CDI" in Question 11. MEMC asserts that a "bright line" was needed between CDI's involvement in the bid process and its lack of involvement in contract negotiations. Without it, MEMC argues, Triad was able to use CDI's agency "as a mallet" and MEMC was harmed.

We disagree that the trial court erred in refusing MEMC's proposed instruction. Question 11 asked only whether MEMC and Triad agreed to include Addendum 9 in their contract; the jury was not instructed to consider the statements or conduct of CDI or to consider whether the actions of others may be attributed to MEMC through principles of agency. Notably, the trial court also overruled Triad's objection and request to include an instruction on CDI's actual or apparent authority in Question 11. Therefore, MEMC's proposed instruction would not have assisted the jury in answering the question concerning MEMC and Triad.

### 7. Issues 18 and 19: Question 12's Submission

In Issues 18 and 19, which MEMC briefs together, MEMC contends that the evidence is legally and factually insufficient to support the jury's finding in Question 12 that MEMC was estopped from claiming that Addendum 9 was not part of its agreement

21

with Triad. Because the evidence was insufficient to support the question, MEMC asserts, it should not have been submitted.

Question 12 asked the jury: "Is MEMC estopped from claiming that Addendum 9 is not part of its agreement with Triad?" Question 12 included the following instructions:

> Estoppel bars a party from asserting, to another's disadvantage, a right inconsistent with a position previously taken by that party. This doctrine applies when it would be unconscionable to allow a party to maintain a position inconsistent with one in which it had acquiesced, or from which it had accepted a benefit.
>
> In considering whether MEMC is estopped, you are instructed that MEMC's conduct includes the conduct of any other who acted with MEMC's authority or apparent authority.

The instruction also included the same definitions of "authority" and "apparent authority" used in Question 10, along with a definition of "ordinary care" as "that degree of care that would be used by a person of ordinary prudence under the same or similar circumstances." The jury answered "yes" to the question.

MEMC contends that the evidence is legally and factually insufficient because the only conceivable evidence of estoppel is Cline's email to Trueblood in which Cline stated, "Consequential damages – so MEMC eats." MEMC argues that the email was not copied to anyone at MEMC and there is no evidence MEMC saw it. Further, MEMC maintains that any agency status enjoyed by CDI ended after it recommended Triad. MEMC also points out that CDI never saw the final contract and asserts that Cline, CDI's construction manager, had no authority from either MEMC or CDI to "interpret contracts." Because there was no evidence that MEMC acquiesced in or accepted any benefit from Cline's email, MEMC maintains, it was error to submit Triad's affirmative defense of quasi-estoppel to the jury. *See Steubner Realty 19, Ltd. v. Cravens Road 88, Ltd.*, 817 S.W.2d 160, 164 (Tex. App.—Houston [14th Dist.] 1991, no writ) (quasi-

estoppel applies "where it would be unconscionable to allow a person to maintain a position inconsistent with one in which he acquiesced, or of which he accepted a benefit").

MEMC's premise is flawed because there was evidence from which the jury could have concluded that MEMC led Triad to believe that Addendum 9 was included in the terms and conditions of the contract. As discussed above, there was evidence that MEMC authorized CDI to (1) send the proposed terms and conditions of the RFP, including all addenda, to Triad; (2) advise Triad that exceptions to the terms were "highly discouraged"; and (3) provide Triad with instructions on how to except to any terms. In accordance with those terms, Triad did not except to the inclusion of Addendum 9 in its response to the RFP. Further, when confusion arose as to which terms governed the parties' relationship after the contract was awarded to Triad, MEMC confirmed that "CDI's T&C's will govern" and amended the PO to reflect this fact.

Even after the accident, when Triad requested that CDI, which was also MEMC's authorized construction management company, to forward a copy of the contract with all addenda, CDI responded by sending, among other items, Addendum 9. And although MEMC complains that Cline had no authority to "interpret contracts," MEMC emailed Cline after the accident and resulting loss of production, asking him to advise MEMC on "Triad's financial liability for this production outage under the terms of the construction agreement." Cline later responded to Triad that Triad had no liability: "Consequential damages – so MEMC eats." Additionally, Doug Rice, MEMC's corporate representative, acknowledged that it was Cline's job "to know and thoroughly understand" MEMC's contract with Triad.

This evidence is legally and factually sufficient to support the jury's finding that MEMC was estopped from claiming that Addendum 9 was not part of its agreement with Triad, and therefore the trial court did not err by submitting the question to the

jury. We overrule MEMC's Issues 18 and 19.

Because we hold that the evidence and the charge as submitted to the jury support the jury's findings that Triad and MEMC agreed to include Addendum 9 in their contract and that MEMC is estopped from claiming that Addendum 9 is not part of its contract with Triad, we do not reach MEMC's Issues 20, 21, and 22 concerning the evidence supporting Triad's negligence, the charge on damages for Triad's breach of contract, and the jury's refusal to award MEMC attorney's fees.

## B.    Triad's Negligence and the Economic Loss Rule

The jury found that the negligence of Triad, Riddle, and MEMC proximately caused the occurrence and injury in question and attributed the percentage of responsibility to Triad, Riddle, and MEMC at 30%, 30%, and 40%, respectively. However, the trial court awarded a take-nothing judgment in favor of Triad. We conclude that, as to Triad, the trial court did not err because MEMC's negligence claim is barred by the economic loss rule.

The economic loss rule generally precludes recovery in tort when the only economic loss to the plaintiff is the subject matter of a contract. *Sw. Bell Tel. Co. v. DeLanney*, 809 S.W.2d 493, 494–95 (Tex. 1991); *Arlington Home, Inc. v. Peak Envtl. Consultants, Inc.*, 361 S.W.3d 773, 779 (Tex. App.—Houston [14th Dist.] 2012, pet. denied). The nature of the injury most often determines what duty is breached. *Arlington Home*, 361 S.W.3d at 779. When a plaintiff seeks damages for breach of a duty created under a contract rather than a duty imposed by law, tort damages are precluded. *Id.*; *see Jim Walter Homes, Inc. v. Reed*, 711 S.W.2d 617, 618 (Tex. 1986) ("When the injury is only the economic loss to the subject of a contract itself, the action sounds in contract alone.").

MEMC admits that it alleged that Triad "did not comply with its contractual

24

obligation to see that Riddle performed its work safely." MEMC argues that the economic loss rule does not apply, however, because it also contended that Triad was "actively negligent by distracting the Riddle employees while they were working on energized equipment." MEMC also argues that economic damages may be recovered when accompanied by physical damage, citing Triad's incident reports confirming that the accident caused property damage to the transformer.[8]

In this case, MEMC had a contract with Triad, and MEMC sued Triad for allegedly breaching that contract by failing to properly supervise and coordinate the activities of its subcontractors. MEMC recited variations of these same allegations in its negligence claim. The gist of MEMC's tort claim was that Triad negligently performed the contract by failing to properly supervise, coordinate, and staff the project. Moreover, at trial, MEMC sought the same economic damages—$23 million in consequential damages—for both its negligence and breach of contract claims.

Under these circumstances, MEMC's claim against Triad sounds solely in contract and is barred by the economic loss rule. *See DeLanney*, 809 S.W.2d at 494–95 (plaintiff's negligence claim for lost profits arising from defendant's failure to publish advertisement sounded only in contract); *Jim Walter Homes*, 711 S.W.2d at 617–18

---

[8] MEMC also contends that Triad failed to preserve its issue for review, noting that Triad did not plead the economic loss rule, it was not the subject of a motion for directed verdict, and was not the basis of any objection to the jury charge. However, Triad raised the issue in a post-trial motion to disregard jury findings in which it argued that "[a]s a matter of law, any negligence claim against Triad is barred by the economic loss doctrine." In *Holland v. Wal-Mart Stores, Inc.*, the Supreme Court of Texas held that a question of law asserted in a motion for judgment notwithstanding the verdict preserves an issue for review if the legal question is one that the trial court is not required to resolve before the jury could properly perform its fact-finding role. *See* 1 S.W.3d 91, 94 (Tex. 1990) (per curiam). Because the trial court in this case was not required to resolve the legal issue of whether the economic loss rule barred MEMC's recovery of damages before the jury could properly assess whether Triad was negligent and the percentage of its responsibility, Triad has preserved the issue for review. *See id.* MEMC's citation to *Equistar Chemicals, L.P. v. Dresser-Rand Co.*, is inapposite because in that case, which involved a different application of the economic loss rule, the court held that the defendant's challenge to the measure of damages the jury was instructed to use was not preserved when the defendant did not object to the jury charge. *See* 240 S.W.3d 864, 867–68 (Tex. 2007).

(plaintiff's claim for builder's alleged negligence in supervision of home construction can only be characterized as a breach of contract); *Arlington Home*, 361 S.W.3d at 780 (economic loss rule barred home purchaser's negligence claim against mold assessment consultant, as only duty allegedly breached was a duty created by contract); *Stauffacher v. Coadum Capital Fund 1, LLC*, 344 S.W.3d 584, 591 (Tex. App.—Houston [14th Dist.] 2011, pet. denied) (breach of fiduciary claim failed when plaintiff put on "no evidence of damages independent of those suffered" as a result of defendant's breach of contract). We hold that the economic loss rule bars MEMC's recovery of negligence damages from Triad.

## C.    Disposition of MEMC's Issues as to Triad

We affirm the trial court's take-nothing judgment in favor of Triad.

## II.    MEMC's Negligence Claims and Comparative Responsibility

The jury found that MEMC's negligence proximately caused the occurrence and injury in question and apportioned MEMC's comparative responsibility at 40%. In MEMC's issues 1 through 10, MEMC challenges the legal and factual sufficiency of the evidence supporting the jury's negligence and damages findings. MEMC also contends that the trial court's charge on the negligence and damages issues was flawed in several respects.

### Overview of Negligence and Comparative Responsibility

Riddle and Triad bore the burden to prove MEMC was negligent and the percentage of comparative responsibility attributable to MEMC. *See Enright v. Goodman Distr., Inc.*, 330 S.W.3d 392, 396 (Tex. App.—Houston [14th Dist.] 2010, no pet.).

The elements of a negligence claim are (1) a legal duty, (2) breach of that duty, and (3) damages proximately caused by the breach. *IHS Cedars Treatment Ctr. of*

*DeSoto, Texas, Inc. v. Mason*, 143 S.W.3d 794, 798 (Tex. 2004). Proximate cause has two elements – cause in fact (or substantial factor) and foreseeability. *Id*. These elements cannot be satisfied by mere conjecture, guess, or speculation. *Id*.; *Doe v. Boys Clubs of Greater Dallas, Inc.*, 907 S.W.2d 472, 477 (Tex. 1995). Cause in fact is established when the act or omission was a substantial factor in bringing about the injuries, and without it, the harm would not have occurred. *IHS*, 143 S.W.3d at 799; *Doe*, 907 S.W.2d at 477. If negligence merely furnishes a condition that made the injuries possible, there can be no cause in fact. *W. Invs., Inc. v. Urena*, 162 S.W.3d 547, 551 (Tex. 2005). "Foreseeability" means that the actor, as a person of ordinary intelligence, should have anticipated the dangers that his negligent act created for others, although it does not require an actor to anticipate the precise manner in which the injury will occur. *Lee Lewis Constr., Inc. v. Harrison*, 70 S.W.3d 778, 785 (Tex. 2001).

Contributory negligence contemplates an injured person's failure to use ordinary care in regard to his or her own safety. *Kroger Co. v. Keng*, 23 S.W.3d 347, 351 (Tex. 2000); *see* Tex. Civ. Prac. & Rem. Code § 33.002(a)(1). Because comparative responsibility involves measuring the parties' comparative fault in causing MEMC's injuries, it necessitates a preliminary finding that MEMC was in fact contributorily negligent. *See Keng*, 23 S.W.3d at 351.

### A.    Issues 2(C), 4, 5, and 6: Jury Instruction on CDI's Agency in Question 3

In Question 3, the jury was instructed to consider CDI's acts or omissions in the construction phase of the project as the acts of MEMC.[9] According to MEMC, the trial

---

[9] We normally address sufficiency issues before charge issues. *See Lone Star Gas Co. v. R.R. Comm'n of Tex.*, 767 S.W.2d 709, 710 (Tex. 1989) (per curiam) (noting that points calling for rendition of judgment should be considered before points calling for remand). In this case, however, we first address the question of whether CDI was MEMC's agent as a matter of law because the trial court's instruction authorized the jury to consider the acts of both MEMC and CDI when determining

court's instruction was error because the defendants did not prove that CDI was MEMC's agent in the construction phase of the P-23 project as a matter of law and therefore the instruction equating CDI to MEMC violated *Casteel*.[10] MEMC also contends that the trial court erred by submitting the instruction over its objection and refusing MEMC's tendered question omitting the instruction. Further, MEMC asserts, the trial court's error infected Question 4, in which the jury was asked to apportion the comparative responsibility of MEMC, Triad, and Riddle.

An agency relationship will not be presumed, and the party asserting the relationship has the burden to prove its existence. *Schultz v. Rural/Metro Corp. of New Mexico-Texas*, 956 S.W.2d 757, 760 (Tex. App.—Houston [14th Dist.] 1997, no pet.). To prove the existence of an agency relationship, the proponent must show that the alleged principle has both the right to assign the agent's task and to control the means and details of the process by which the agent will accomplish the assigned task. *Id.* An agency relationship may be shown by direct testimony or by circumstantial evidence showing the relationship of the parties and their conduct concerning the transaction at hand. *Id.*

MEMC acknowledges that it contracted with CDI for construction management, and that Rice, MEMC's general manager and representative, testified that CDI was delegated certain tasks and provided engineering and construction management on the project. But MEMC contends that Rice's testimony that CDI could be an agent—defined by Triad's counsel as MEMC's "eyes and ears on the ground"—did not demonstrate that MEMC controlled the details of how CDI was to accomplish its

---

whether the evidence supported a negligence finding against MEMC.

[10] *See Crown Life Ins. Co. v. Casteel*, 22 S.W.3d 378, 389 (Tex. 2000) ("When a single broad-form liability question erroneously commingles valid and invalid liability theories and the appellant's objection is timely and specific, the error is harmful when it cannot be determined whether the improperly submitted theories formed the sole basis for the jury's finding.").

28

assigned tasks.[11] MEMC also argues that the contract between it and CDI, the most determinative evidence of the parties' relationship, was not in evidence, and suggests that CDI could have been an independent contractor. Accordingly, MEMC asserts, CDI's agency was not proven as a matter of law and the trial court's instruction based on its implied finding of agency was error.

As noted above, CDI's cover letter for the RFP informed the bidders that CDI was "acting as agents for the MEMC P-23 Project." The PO MEMC sent to Triad further provided that "[t]his scope of work at the MEMC Pasadena Site is under the direction of CDI"; CDI "will communicate all engineering, construction and specification documents for this work"; and CDI "will administer this work by authority of MEMC." Rice testified that CDI was MEMC's "agent for construction on site," had MEMC's "authority to deal with the actual contractors on-site," and was "acting as [MEMC's] agent in doing the engineering." MEMC's project director, James Mallinak, likewise testified that MEMC delegated the day-to-day work on the project to CDI and that CDI was "in charge of the construction management" on MEMC's behalf.[12]

This evidence conclusively shows that CDI was MEMC's agent. Because MEMC points to no contrary evidence, the trial court did not err by instructing the jury to consider CDI's acts and omissions those of MEMC. We overrule CDI's Issues 2(C), 4, 5, and 6.

## B.  Issues 1 and 2(A)–(B): Evidence of MEMC's Negligence

In these issues, MEMC contends the evidence is legally and factually insufficient to show that MEMC's conduct (or that of its agent, CDI) was a proximate cause of the

---

[11] Although MEMC argued there was no or insufficient evidence to support the instruction in Question 3, MEMC did not articulate the requirements of an agency relationship or argue that the defendants failed to present evidence of any specific requirement as it does on appeal.

[12] During closing argument, MEMC's counsel also admitted that "[t]here's no doubt that CDI had authority to manage the construction[]."

occurrence and injury as the jury found in Question 3. MEMC argues that the defendants alleged that MEMC and CDI were negligent in the following ways:

- MEMC's plant did not have a backup power supply or generator system to keep the plant in operation if power was interrupted.

- CDI failed to design or procure a transformer box with a Micarta board barrier sealing the underside of the box to prevent incursion of the box when Riddle pushed the metal fish tape through the conduit.

- CDI failed to install the Micarta board at Riddle's suggestion.

- CDI prepared Riddle's scope of work and knew a short would interrupt the power supply to the plant.

- MEMC was responsible for rushing the work because the project was behind schedule.

- MEMC could have powered down the plant to allow the work to be performed while the transformer box was de-energized.

- CDI did not monitor Riddle's work.

- MEMC personnel crossed the tape barricade and interrupted Riddle's work to perform a switching operation at the transformer.

### 1. *MEMC Personnel Crossing the Barricades*

First, MEMC acknowledges that its employees crossed Riddle's barricades to perform a switching operation (involving switching power from one incoming line and killing another) at the T-45 transformer while Riddle and Triad personnel were already in the area. But MEMC contends the evidence shows that they left well before Riddle began pushing the fish tape into the conduit.

According to MEMC, Riddle was aware MEMC's personnel were coming to perform the switching operation that day. When MEMC arrived, Hines and Chesson stopped what they were doing to let MEMC work. MEMC performed the switching operation with Riddle's assistance, and the work took about thirty minutes. Mike Powell, MEMC's electrical and instrumentation supervisor, told Hines that the disengaged line would be completely de-energized that morning if Riddle chose to delay

30

its work, but Riddle declined and Powell left. Sometime later, Hines and Chesson argued about the proper way to push the fish tape. When Chesson went around to the back and began pushing the tape from "not to hot" as Hines had instructed, Hines was having a discussion with a Triad employee and was not in a position to intercept the fish tape as planned. Powell estimated that he had been gone from the area about "five to ten minutes" when the power to the plant went down.

Because MEMC personnel had left the area well before the accident, MEMC argues that even if its act of crossing the barriers was negligent, it was not contemporaneous to Riddle's activity and was too attenuated to have been a substantial factor in bringing about the accident. MEMC further contends that there was no evidence that MEMC could foresee its activity would have created a danger that Riddle would push the fish tape into the transformer. *See IHS*, 143 S.W.3d at 798–99.

In response to MEMC's arguments, Riddle and Triad point to Chesson's testimony that MEMC interrupted Riddle's work. Chesson also stated that part of what caused the accident was "people coming into [Riddle's] work area . . . right before the incident happened" and "cross[ing] the barricades." Chesson specifically clarified that he was referring to MEMC's personnel. Chesson further testified MEMC's appearance in the work area surprised them and made them "stop and take a step back" while MEMC performed the switching operation. Hines similarly testified that while Riddle was working in the barricaded area, MEMC interrupted its work by crossing the barricades. Hines also stated that he saw no Triad personnel in the area at that time. Additionally, Powell, Chesson, and others testified that at the post-accident meeting, it was discussed that all parties, including MEMC, bore some responsibility for the accident. An incident investigation report also listed MEMC's interruption of Riddle's work in the barricaded area as one of the contributing causes of the accident. Further, Powell testified that two of the people who assisted in working on the switchgear were

31

still in the area removing their gear when they saw the flash.

From this evidence, the jury reasonably could have concluded that MEMC's interruption of Riddle's ongoing work in the barricaded area affected Riddle's work and contributed to the accident. The jury also could have concluded that, because MEMC employees were still near the area when the accident occurred, that the accident happened much sooner after MEMC completed its work than Powell estimated and that the effect of the interruption had not ended when the accident occurred. Therefore, the evidence was legally and factually sufficient to support a finding that MEMC's negligence was a proximate cause of the accident.

### 2. CDI's Failure to Obtain a Transformer Box with a Micarta Board Barrier to Prevent Entry of Metal Fish Tape

At trial, Triad and Riddle contended that CDI was negligent in failing to provide a transformer box with protective barriers or "deflector panels" known as Micarta board to shield the energized portion of the switchgear inside the transformer from the incursion of the metal fish tape, which would have prevented the accident. MEMC contends that there was no evidence that CDI designed, specified, or purchased the transformer box. Specifically, MEMC argues that CDI's engineering/design drawings and specifications for the transformer were not in evidence; there was no document showing CDI bought the transformer; Triad denied purchasing it; and Riddle merely speculated that the existence (or not) of deflector plates was a design issue.

Hines, Riddle's supervisor on the job, testified that some switchgear comes with protective barriers and some does not, and he did not know whether it was a design issue or the choice of the owner. Hines did not know who purchased the switchgear for this particular job. There was also some testimony from MEMC and Riddle suggesting that Triad may have purchased the equipment. However, MEMC witnesses, including Mallinak and Rice, repeatedly testified that CDI was responsible for performing the

32

engineering, procurement, and construction management for the expansion project. And although Rice did not have firsthand knowledge whether CDI or Triad purchased the particular switchgear at issue, he testified that he understood that CDI, as MEMC's engineering and procurement representative, made the purchase. Moreover, Morgan testified that CDI controlled virtually everything about the specifications and drawings for the project, and he denied that Triad purchased the transformer. This evidence is legally and factually sufficient to support a finding that MEMC designed, specified, and purchased the transformer box and switch gear at T-45.

### 3. CDI's Failure to Install the Micarta Board Barrier and the Scope of Work

MEMC contends that there was no evidence that CDI was negligent for failing to install the Micarta board barrier. MEMC points to a series of events beginning with Holden's testimony that he asked Triad to install the three barriers when he first walked through the job site with Charlie Fair. CDI then prepared a written scope of work reflecting this request.[13] After Riddle was awarded the contract, Holden again walked the site with Fair and saw that only two of the three Micarta boards had been installed. When he pointed out the discrepancy, Fair explained that Triad was under a time constraint and did not have time to get it done—indicating, MEMC argues, that Triad was responsible for failing to install all of the Micarta board barriers.

Other than Holden's testimony, MEMC argues, there is no evidence as to who

---

[13] The scope of work CDI prepared included the following statement:

> Due to the fact that Substation-45 has a 2400 volt transformer (T-45) that has been energized from previous activities, and that it is not preferable to de-energize this load, Riddle Power LLC, has been contacted to evaluate whether the added conductors can be established without deenergizing T-45. After visiting the site and reviewing the scope of work, it has been determined by Riddle that it is feasible to perform this work energized. Certain added protective barriers will have to be installed prior to this activity but contain minimal monetary impact and will not affect the schedule.

actually installed the Micarta board, and no testimony that CDI was involved in the installation of the Micarta board or otherwise knew the task had not been completed. Further, although Triad denied any role in the installation because Triad did not do hot work, MEMC argues that the transformer was not energized at the time Riddle requested the Micarta board be installed and so the installation would not have been hot work for Triad. MEMC also contends that the absence of a barrier is irrelevant to MEMC's alleged contributory negligence, because Riddle was hired as the hot work expert and admitted that whether a complete set of barriers were there would not have affected the way in which Riddle approached its work.

Both Triad and Riddle witnesses testified that had the switchgear inside the transformer been protected by a Micarta board barrier at the bottom, it would have prevented the metal fish tape from coming into contact with the energized bus and the accident could not have happened. CDI's scope of work for Riddle stated that added protective barriers would be installed before Riddle began its work, and although two of the three barriers were installed, the barrier at the bottom of the switchgear was not. Riddle denied installing the Micarta boards, and Triad stated that they would not have installed them because they did not do hot work. Morgan of Triad also testified that the transformer was a piece of equipment that Triad would not alter under any circumstances, the installation of the barriers was not within its scope of work, and Triad did not contract with Riddle to perform the work. Further, the scope of work prepared by CDI did not even mention Triad.

Thus, even though there was some testimony that Triad was responsible for installing the Micarta boards, there was also testimony to the contrary, and the jury was entitled to resolve any conflicts in Triad's favor. The jury also could have inferred that if neither Triad nor Riddle installed the barriers, then CDI was responsible for installing only two of the three barriers. *See City of Keller*, 168 S.W.3d at 821; *see also Lozano v.*

34

*Lozano*, 52 S.W.3d 141, 148 (Tex. 2001) (noting that "[i]f circumstantial evidence will support more than one reasonable inference, it is for the jury to decide which is more reasonable"). Therefore, we conclude that the evidence is legally and factually sufficient to support a finding that CDI was responsible for failing to install the third barrier, which would have prevented the accident from occurring.

### 4.    CDI's Failure to Monitor Riddle's Work

MEMC acknowledges that CDI would not ignore obvious safety issues if observed. But, MEMC contends, Triad was responsible for the safety of its work and that of its subcontractor, Riddle, as evidenced by the contract between MEMC and Triad. MEMC also points to Morgan's testimony affirming Triad's contractual responsibility to ensure the safety of the services provided under its contract with MEMC. Further, MEMC argues that Triad's contract with Riddle also required Riddle to comply with Triad's safety plan subject to termination. Therefore, MEMC contends, the evidence flatly contradicts the argument that CDI was responsible for monitoring Riddle's work.

In response, Triad and Riddle point to MEMC's testimony that CDI had overall responsibility for safety at the site but had no one monitoring Riddle's work on the day of the accident. Mallinak, MEMC's project director, testified that CDI, which was in charge of construction management, was responsible for directing the construction management activities of the contractors, including coordination of the trades. Mallinak also explained that CDI's safety organization helped administer the overall construction safety program during the expansion project, while each contractor also had its own safety program and employees.[14] Similarly, Rice acknowledged that "CDI was

---

[14] Mallinak also stated that MEMC had a safety manager on site, along with a couple of employees, who were "ultimately responsible for the safety of the site," but he could not identify MEMC's safety manager or say where that person was on the day of the accident.

responsible for the project safety management" and that each contractor had its own safety responsibility as well. Rice also acknowledged that everyone involved was responsible for the safety of themselves and others. There was also testimony that no one from CDI was present on the day of the accident to monitor Riddle's activities, even though it involved a "life-critical" activity. Based on this evidence, the jury reasonably could have concluded that CDI bore some responsibility for safety-related failures on the day of the accident.

### 5. *CDI's Standard of Care*

Finally, MEMC contends that no expert was called to provide the standard of care applicable to CDI in its engineering, procurement, and construction management role or whether it was breached. Specifically, MEMC argues that whether CDI properly designed or specified the proper transformer or properly discharged its legal duties as a construction manager required expert testimony. *See FFE Transp. Servs., Inc. v. Fulgham,* 154 S.W.3d 84, 91 (Tex. 2004); *3D/I + Perspectiva v. Castner Palms, Ltd.*, 310 S.W.3d 27, 29 (Tex. App.—El Paso 2009, no pet.). According to MEMC, such evidence was required, and therefore lay opinion testimony was insufficient to establish proximate cause as to CDI's acts or omissions.

However, CDI's negligence was not based on its role as an engineer in designing a transformer, but was based in part on CDI's failure to install a protective barrier on the transformer—which would have prevented the fish tape from contacting the energized switchgear and causing the accident—after CDI advised Riddle the barrier would be installed. Further, in this case, CDI's failure to install the protective barrier, after stating it would be installed, would not be an issue beyond the common understanding of a jury for which expert testimony was necessary. *See Ching Enters., Inc. v. Barahona*, No. 01-07-00454-CV, 2008 WL 4006758, at *6–8 (Tex. App.—Houston [1st Dist.] Aug. 28, 2008, no pet.) (mem. op.) (plaintiff's lay testimony that grating machine "lacked a plate

device that would have prevented her hands from getting near the blades" was sufficient to support defendant's negligence without expert testimony); *cf. Potter v. Garner*, 407 S.W.2d 537, 538–41 (Tex. Civ. App.—Tyler 1966, writ ref'd n.r.e.) (lay testimony of plaintiff that employer furnished a power saw without a protective guard supported findings of employer's negligence). Likewise, evidence of CDI's failure to monitor Riddle's activities despite its responsibility for overall project safety is not a matter beyond a juror's common understanding. *See Morgan v. Compugraphic Corp.*, 675 S.W.2d 729, 733 (Tex. 1984) ("Generally, lay testimony establishing a sequence of events which provides a strong, logically traceable connection between the event and the condition is sufficient proof of causation.").

In summary, legally and factually sufficient evidence existed from which the jury could have concluded that MEMC personnel crossed Riddle's barricades and interrupted its work shortly before the accident occurred, CDI failed to provide a transformer box with a Micarta board barrier, CDI failed to install one of the Micarta boards Riddle specifically requested, and that either CDI or MEMC failed to monitor Riddle's work.[15] The jury also could have concluded that any one of these alone, or any combination of them, was a proximate cause of the accident. *See Lear Siegler, Inc. v. Perez*, 819 S.W.2d 470, 471 (Tex. 1991) ("There may be more than one proximate

---

[15] MEMC spends a considerable portion of Issue 1 arguing that, absent jury findings and evidence holding MEMC accountable as a premises owner, the negligence finding against MEMC cannot stand. Specifically, MEMC urges that the defendants' allegations of negligence specific to MEMC (with the exception of crossing Riddle's barriers and interrupting its work) are not based on evidence of contemporaneous activity, but are instead complaints about the conditions under which Riddle performed its work, and that evidence of the condition of the premises is not evidence of proximate cause. *See Urena*, 162 S.W.3d at 551; *Doe*, 907 S.W.2d at 477. Further, because the evidence supports only a claim of premises liability and the defendants did not obtain any findings to support such a claim, MEMC maintains that the defendants have waived that theory. *See Clayton W. Williams, Jr., Inc. v. Olivo*, 952 S.W.2d 523, 529 (Tex. 1997). We need not address either of MEMC's contentions, however, because the evidence is sufficient to support the jury's finding that CDI's negligence, as agent for MEMC, was a proximate cause of the accident based on one or more of the four negligent acts and omissions discussed above.

37

cause of an event."). We overrule MEMC's Issues 1 and 2(A)–(B).

### C.    Issue 3: MEMC's Comparative Responsibility

In Issue 3, MEMC contends that there was no evidence or factually insufficient evident to support the jury's finding that MEMC was 40% responsible for the incident and injury. According to MEMC, Riddle acknowledged it should not have done what it did, and Triad contributed to the accident by having its workers in the barricaded area and distracting Hines from his post when Chesson began pushing the fish tape. Therefore, MEMC argues, there would have been no accident if Hines had been there. MEMC also argues that the post-accident meeting—in which the parties discussed the contributing causes of the accident and agreed that each could have done things differently—is no evidence of legal causation; instead, it is no more than a discussion of responsibility in the philosophic sense, which is too remote to be a substantial factor in bringing about the injury. *See Lear Siegler*, 819 S.W.2d at 472 (explaining that in certain circumstances, there may be no legal cause if the connection between the negligence and the injury is too attenuated or remote).

As discussed above, there was ample evidence supporting the jury's findings on MEMC's negligence and proportionate responsibility. In particular, the jury could have assigned great weight to CDI's failure to install the Micarta board barrier Riddle requested. CDI's scope of work indicated that Riddle requested the installation of the barrier to make its work "feasible" and evidence showed that the installation of the barrier would have prevented the accident. The jury is given "wide latitude in performing its sworn duty to serve as the fact finder in allocating responsibility." *Pasadena Ref. Sys., Inc. v. McCraven*, No. 14-10-00837-CV, 2012 WL 1693697, at *8 (Tex. App.—Houston [14th Dist.] May 15, 2012, pet. dism'd) (mem. op.). Even if the evidence could support a different percentage allocation of responsibility, we will not substitute our judgment for that of the jury. *See id.*; *Samco Props., Inc. v. Cheatham*,

977 S.W.2d 469, 478 (Tex. App.—Houston [14th Dist.] 1998, pet. denied). We overrule MEMC's Issue 3.

### D.    Issue 7: Triad's Right to Control Riddle's Work

In Issue 7, MEMC complains that the trial court erred by refusing to grant a directed verdict that Triad retained a contractual responsibility to control the safety of Riddle's work. A general contractor can retain the right to control an aspect of an independent contractor's work or project so as to give rise to a duty of care to that independent contractor's employees in two ways: by contract or by actual exercise of control. *Lee Lewis Constr.*, 70 S.W.3d at 783. To support its argument that Triad's right to control safety was retained by contract as a matter of law, MEMC points to the requirement that Riddle comply with Triad's safety policy in its subcontract with Triad, and Morgan's acknowledgment of this responsibility. *See Tovar v. Amarillo Oil Co.*, 692 S.W.2d 469, 470 (Tex. 1985) (per curiam) (general contractor that exercised contractual control over subcontract liable for failing to exercise reasonable care in supervising subcontractor's activity).

Determining whether a contract provides for a retained right of control is generally a question of law for the court, while determining whether someone exercised actual control is generally a question of fact for the jury. *Lee Lewis Constr.*, 70 S.W.3d at 783. In this case, the fact that Triad may have required Riddle to "comply with Triad's safety plan" and safety-related rules does not demonstrate that Triad had the right to "control" Riddle as a matter of law. *See Hoechst-Celanese Corp. v. Mendez*, 967 S.W.2d 354, 357–58 (Tex. 1998) (per curiam) ("Celanese's insistence that Mundy observe and promote compliance with federal laws, general safety guidelines, and other safety precautions did not impose an unqualified duty of care on Celanese to ensure that Mundy employees did nothing unsafe."); *Moss v. Waste Mgmt. of Tex., Inc.*, 305 S.W.3d 76, 82 (Tex. App.—Houston [1st Dist.] 2009, pet. denied) (contractual

39

provisions under which the defendant retained a right to inspect, review, and monitor another company's performance "do not indicate that [the defendant] retained control over the details of [the other company's] work").

The contract between Triad and Riddle nowhere assigns Triad the right to control Riddle. To the contrary, it provides that Riddle is to "[f]urnish all necessary supervision, labor, materials, tools, [and] construction equipment" and that Riddle "shall operate as an independent contractor and not as [an] agent of [Triad]." A contract expressly providing that a person is an independent contractor is determinative of the relationship absent evidence that the contract was subterfuge, that the hiring party exercised control in a manner inconsistent with the contract provision, or if the written contract has been modified by subsequent agreement, either express or implied. *Weidner v. Sanchez*, 14 S.W.3d 353, 373 (Tex. App.—Houston [14th Dist.] 2000, no pet.); *see also Farlow v. Harris Methodist Fort Worth Hosp.*, 284 S.W.3d 903, 911 (Tex. App.—Fort Worth 2009, pet. denied) (same). MEMC points to no such evidence suggesting that the parties' legal relationship is something other than represented in the parties' contract.

Because the contract between Triad and Riddle did not explicitly assign Triad the right to control Riddle, the trial court correctly denied MEMC's motion for directed verdict. We overrule MEMC's Issue 7.

### E.     Issue 8: Denial of MEMC's Instruction on Triad's Right to Control Riddle

In Issue 8, MEMC contends that the trial court erred by denying MEMC's request for additional instructions in Question 2. In Question 2 the jury was asked whether Triad's negligence proximately caused the occurrence and injury, accompanied by the standard definitions of "negligence," "ordinary care," and "proximate cause." MEMC contends that the trial court erred by overruling its objection to Question 2 and denying its request that the jury be instructed to consider Triad's negligence with regard to any

retained right to control the safety of Riddle's work.

When the parties' contract does not expressly grant a right of control, as in this case, a duty of control is not implicit and the plaintiff bears the burden to prove a right of control as a predicate to liability. *Moss*, 305 S.W.3d at 82. Triad points to the following evidence it contends demonstrates Triad's retained actual control over the safety of Riddle's work: Holden's discussions with Triad concerning the installation of the Micarta board; Triad's assertion that it had not had time to install the barriers; and Triad's failure to install pull ropes in the conduit so that a fish tool would not be needed to pull cable and providing a metal fish tape for Riddle to use instead. MEMC argues that this evidence shows that Triad's acts and omissions caused Riddle to vary its own safe work procedure and the way it intended to work. MEMC also argues that if the finding that the parties agreed to waive consequential damages is unsupportable, then MEMC is harmed by the failure to submit the control instruction, since Triad would have been liable not only for its own 30% but also Riddle's 30% comparative responsibility.

As explained in the discussion of Issues 1 and 2 above, there was conflicting evidence concerning which party was responsible for the installation of the Micarta board. And although the installation of pull ropes may have made Riddle's job easier, Riddle decided to use a fish tape to pull the cable and there was testimony that Riddle merely borrowed the metal one from Triad because its own fish tape was not immediately available. Additionally, there was evidence that Riddle was hired because it was an expert in high-voltage work, and MEMC expected Riddle to supervise its own job. In contrast, Triad had no expertise in energized work, it did not tell Riddle how to do its work or oversee that work, and it did not prepare Riddle's scope of work. Nor was Triad involved with Riddle's job safety analysis or inspecting Riddle's cable pull. The evidence at most shows that a fact issue existed concerning Triad's exercise of a right of

control over Riddle, but MEMC obtained no predicate jury issue or obtain a jury finding on whether Triad had the right to control Riddle. Nor did MEMC plead that Triad was vicariously liable for Riddle's work. Therefore, the trial court did not err in denying the instructions.

Moreover, MEMC argues that it is harmed by the submission only if the jury's finding that the parties agreed to waive consequential damages is unsupportable, but we have concluded otherwise. In any event, MEMC was not harmed because in Question 2, the jury found Triad negligent. Therefore, the absence of an instruction on control had no practical effect on the verdict and did not probably cause the rendition of an improper judgment. We overrule MEMC's Issue 8.

### F.     MEMC's Damages

The jury found MEMC's lost profits damages were $300,000. MEMC contends the jury's finding is both inadequate and not based on any evidence. Further, MEMC contends the trial court failed to supply the correct measure of damages.

### 1.     *Issue 9: The Jury's Damages Award*

According to MEMC, the evidence established damages well in excess of the award. MEMC points to its evidence that the power outage completely stopped MEMC's production of granular polysilicon, the detailed production process required multiple steps to restart, and the process required a ramp-up period. MEMC's expert, Kien Luu, put on evidence that it took twenty days to attain pre-accident levels of production and he testified that the difference between actual production and the baseline over those twenty days was 77.2 metric tons. Another MEMC expert, Cozy Marks, testified that the market price for granular polysilicon was $340/kg and the cost of production was $12.67/kg. Multiplying a unit price of $307.33/kg times 77.2 metric tons of lost production, Luu determined that the value of the granular polysilicon not

produced at $23,725,876.00.

MEMC contends that the defendants' expert, Michael Kerschen, agreed with many of MEMC's conclusions, but testified to lost production of 33.4 metric tons. Based on the differing amounts of lost production, MEMC calculates that the range of damages presented to the jury was between $23,725,876 and $10,287,000. Therefore, MEMC argues, the jury's award is inadequate and so contrary to the great weight and preponderance of the evidence as to be clearly wrong and unjust.

Under Texas law, "whether to award damages and how much is uniquely within the factfinder's discretion." *Golden Eagle Archery, Inc. v. Jackson*, 116 S.W.3d 757, 772 (Tex. 2003). A jury thus has broad discretion to award damages within the range of evidence presented at trial. *City of Houston v. Harris Cnty. Outdoor Adver. Ass'n*, 879 S.W.2d 322, 334 (Tex. App.—Houston [14th Dist.] 1994, writ denied). The calculation of lost profit damages is a fact-intensive determination. *Bowen v. Robinson*, 227 S.W.3d 86, 96–98 (Tex. App.—Houston [1st Dist.] 2006, pet. denied). There is no requirement that the evidence show precisely how the jury arrived at the specific amount awarded. *See Mayberry v. Texas Dep't of Agric.*, 948 S.W.2d 312, 317 (Tex. App.—Austin 1997, writ denied). Moreover, a jury is "not tied to awarding damages exactly as requested by the injured party," and it does not have to rely solely on an expert's opinion in calculating damages. *Bayer Corp.*, 214 S.W.3d at 606. However, a jury must have an evidentiary basis for its findings. *Salinas*, 948 S.W.2d at 289.

The defendants argue that MEMC's alleged damages did not turn on the value of MEMC's "lost product." Rather, in Question 5, the jury was asked to award MEMC the "lost profits," if any, that "resulted from the occurrence and injury in question" and that were "a natural, probable, and foreseeable consequence of the occurrence in question." Under Texas law, "lost profits" are "damages for the loss of net income to a business." *Miga v. Jensen*, 96 S.W.3d 207, 213 (Tex. 2002); *Bowen*, 227 S.W.3d at 96. According

43

to the defendants, virtually every aspect of MEMC's damages model was challenged and controverted at trial, and the jury was provided a broad range of damages, if any, from which it could make a finding.

Among the contested issues was the extent to which MEMC was entitled to lost profits damages. The defendants argued that MEMC sold little of its production on the open market for a profit. The defendants point to Marks's concession that MEMC's goal was to internally "consume 100 percent of the poly it produces." There was also evidence that MEMC's priority was to supply other plants with the polysilicon it produced so that MEMC's affiliates could make silicon wafers and semiconductors. Both Marks and Luu acknowledged that MEMC internally transferred polysilicon to MEMC Singapore and that the internal transfer price was only 10% above cost or $83/kg. After MEMC internally transferred the polysilicon, MEMC Singapore or other MEMC affiliates—not MEMC—received the profit when the polysilicon was subsequently sold. Significantly, Marks admitted that "there is no profit [to MEMC] from an internal transfer." Rice also acknowledged that when polysilicon was internally transferred to MEMC Singapore and then sold by MEMC Singapore, the financial benefit from that sale would go to MEMC Singapore, not MEMC. MEMC countered that it lost the value of the product and, if it needed to replace the lost production, it would have to obtain polysilicon on the spot market. Therefore, MEMC maintained, its historic use of the product was irrelevant to its damages model.

Even as to external sales, the price and production volume was disputed. For example, Marks testified about external prices of $195 and $215/kg in August 2007. Luu referred to a market value between $320 and $360/kg. By using the highest ten-day average in 2007, Luu opined that MEMC could produce 8.9 metric tons of polysilicon per day. But Luu acknowledged that using a ten-day window could be "misleading." In contrast, Kerschen testified that the spot price or market value of polysilicon at the time

44

of the incident ranged from $200 to $400/kg.[16] Kerschen also testified that Luu's calculation of 8.9 metric tons of polysilicon per day was "artificially inflated" and not representative of what MEMC could expect to achieve on an ongoing basis. Instead, Kerschen opined that, on average, MEMC could produce only 7.3 metric tons of polysilicon per year, or about six to seven metric tons per day. Based on the assumption that production was impacted from August 28 until September 16, Luu opined that MEMC's lost production amounted to 77.2 metric tons. Kerschen testified that Luu's opinion was "severely overstated." Kerschen estimated that production was impacted for only eight days, and that the lost production was, at most, 33.4 metric tons.

Notably, Luu did not testify as to MEMC's "lost profits." Instead, he merely opined as to "the value of [its] lost production." But Luu admitted that MEMC was never going to externally sell 100% of the polysilicon that it produced in 2007. Luu conceded his "lost production" calculation of $23 million would be accurate only if MEMC "would not have done what [it] had done historically and instead decide[d] to sell 100 percent of what [it] did not produce on the external market." Evidence also showed that, before and after the incident, MEMC internally transferred the majority of the polysilicon that it produced; its external sales on the spot market ranged from 4% to

---

[16] MEMC points out that Kerschen acknowledged MEMC's polysilicon was made to high quality electronic grade rather than lower quality solar grade, and asserts that Kerschen's spot market price did not differentiate between electronic and solar grade. MEMC also points out that Kerschen agreed that MEMC's expert's market price of $320 to $360/kg for electronic grade polysilicon was reasonable, and argues that the jury was not free to disregard the agreement of the experts. However, we disagree with MEMC's premise that the that the amount of lost production was the only variable in dispute and therefore the only reasonable range of damages available to the jury was between roughly $10 and $23 million. Given the volume of conflicting evidence presented, the jury could reasonably have concluded that some lesser award was more appropriate. *Vela v. Wagner & Brown, Ltd.*, 203 S.W.3d 37, 48–49, 51 (Tex. App.—San Antonio 2006, no pet.) (jury was not required to accept expert's damages model but could award amount that fell within the range of evidence presented); *Howell Crude Oil Co. v. Donna Refinery Partners, Ltd.*, 928 S.W.2d 100, 108 (Tex. App.—Houston [14th Dist.] 1996, writ denied) (affirming award of lost profits below amount testified to by expert, even though it was unclear how the jury arrived at its calculation, because the jury could have reasonably concluded the evidence supported the lesser amount).

15% per quarter. In 2007, MEMC and its affiliates externally sold only 158,322 kilograms of polysilicon. In contrast, MEMC transferred over two million kilograms of polysilicon to affiliates. Luu's damages calculations did not take into account corporate distinctions, and he admitted that his opinions were "on behalf of the MEMC parent corporation, not solely on behalf of MEMC Pasadena."

Given these conflicting opinions concerning the damages calculations, the jury was presented with a broad range of possible damages amounts. For example, using MEMC's claimed market value of $320/kg (minus MEMC's variable costs of $12/kg) and external sales of 5%, Triad demonstrated at trial that MEMC's lost profits would be no more than $514,360. And if the jury instead believed, based on the conflicting evidence, that the external sales price would have been $200/kg and MEMC would have sold only 4% of any lost production, the evidence might support a lost profits award as low as $236,913.[17] Because the $300,000 award is well within the range supported by the evidence, we overrule MEMC's Issue 9.

### 2. Charge Error Concerning the Correct Measure of Damages

Lastly, MEMC contends that the trial court erred by failing to submit the correct measure of damages in the jury charge. Question 5 instructed the jury to consider the measure of MEMC's damages as "MEMC's lost profits that were a natural, probable, and foreseeable consequence" of the occurrence in question. MEMC objected to Question 5 and submitted a proposed instruction that would have added the following

---

[17] This calculation is based on 33.4 metric tons x 0.04 in external sales x ($200/k market value - $12.67/kg variable costs). Riddle contends the low range could be determined by using a loss of production of 33,400 kilograms, a net price of $298 per kilogram (MEMC's price of $318/kg minus $20 of variable costs), and a percentage sold for profit of 3% to yield a lost profit calculation of $298,596. Riddle also argues that the jury could have found zero lost profits, because it could have concluded that no further production would have been sold by MEMC for profit given the evidence of zero sales for profit in October and November of 2007.

sentence: "In calculating lost profit you are instructed to consider the market value of the lost production less the cost of production." The trial court refused MEMC's proposed instruction.

MEMC argues that the applicable measure was that which applies to commodities such as crops—the market value of the "crop" minus the cost of harvesting and marketing. *See Int'l Harvester Co. v. Kesey*, 507 S.W.2d 195, 197 (Tex. 1974) ("The general rule for assessing damages for crop losses . . . is 'the market value of the lost portion of his crop, as measured at maturity of the crop, less the cost he would have had in harvesting and marketing the lost portion.'"); *Engelman Irrigation Dist. v. Shields Bros., Inc.*, 960 S.W.2d 343, 351 (Tex. App.—Corpus Christi 1997), *pet. denied*, 989 S.W.3d 360 (Tex. 1998) (per curiam) ("The measure of damages for lost crops is the market value of the crops, less the expenses of cultivating and bringing the crops to market."); *Maxvill-Glasco Drilling Co., Inc. v. Royal Oil & Gas Corp.*, 800 S.W.2d 384, 386–87 (Tex. App.—Corpus Christi 1990, writ denied) (relying on *Kesey* line of cases to hold that instructed verdict for defendant on lost profits was proper when plaintiff presented evidence of lost oil and gas revenues but no evidence of associated production costs).

MEMC maintains that it presented a complete damage model encompassing the lost volume of product and the variable cost of production. Further, MEMC asserts there were no costs associated with bringing polysilicon to market, because customers were coming to MEMC and the polysilicon "sold itself." According to MEMC, the trial court's failure to instruct the jury as to the proper measure of damages allowed the defendants to "skew" MEMC's real damages with argument about MEMC's historic business uses and enabled the jury to come up with a number below even the lowest of the defendants' arguments.

MEMC has failed to demonstrate that the trial court erred by refusing its

47

instruction. MEMC pleaded and sought damages for "lost profits." None of the cases MEMC cites involve jury instructions on the proper measure of damages, and none support MEMC's argument that its historic business use of its product is irrelevant to a determination of lost profits. Indeed, as the court explained in *Maxvill-Glasco*, the recovery of "net profits" requires evidence of gross receipts minus expenses incurred in carrying on the business. *See* 800 S.W.2d at 386–87. Here, MEMC admitted it had no net profits from the internal transfer of polysilicon. We therefore overrule MEMC's Issue 10.

### G. Disposition as to MEMC's Negligence Claims and Comparative Responsibility

We affirm the trial court's judgment awarding MEMC the sum of $90,000 in actual damages, consisting of the award of $300,000 multiplied by Riddle's 30% percentage of responsibility, on its negligence claim against Riddle.

### CONCLUSION

We overrule MEMC's issues and affirm the trial court's judgment.

/s/     Ken Wise
        Justice

Panel consists of Justices McCally, Brown, and Wise.